Booth, J.,
delivered the opinion of the court:
Congress by an act approved March 3, 1889 (30 Stat. L., 1132), authorized the removal of certain impediments to navigation in San Francisco Harbor, Cal. On June 7, 1899, Col. W. H. Heuer, a district engineer of the United States Army, publicly elicited bids for the performance of the work, and in response thereto claimant submitted his proposal, which, being the lowest, was accepted. The written contract annexed to the petition and made a part thereof, was executed by the parties and duly approved as provided therein by the Chief of Engineers on September 29, 1899. On October 4, 1899, claimant was notified of the approval of the contract, and commenced work thereunder on December 3, 1899.
The contract and specifications constituted one instrument, and required the removal of three comparatively large rocks, almost totally submerged, known as Shag Bock No. 1, Shag-Bock No. 2, and Arch Bock. The manner of their removal was left to the discretion of the claimant, subject to the approval of the Engineer officer in charge, the claimant being expressly obligated to remove each of the rocks to a depth of 30 feet below mean low water. Very soon after the commencement of the work differences arose between Col. Heuer and the claimant, resulting finally in the commencement of this suit. The respective items of the claim can best be treated *549 separately. They aggregate the total sum of $101,222.13, made up of separate and distinct complaints and necessarily segregated by counsel in their briefs and arguments.
Item 1: The claim arises under Finding YI. Specification 39 provided as follows: “ The smaller rocks (the Shag Rocks) will be removed first; work on Arch Rock need not be commenced until further appropriation shall be made.” The Engineer officer in construing this Specification construed it strictly, refusing the contractor permission to work conjointly on the two Shag Rocks, holding that all work, including dredging of material blasted, must be entirely completed on one before anything could be done upon the other. The language of the specification is clearly susceptible of two constructions, the one interposed by the engineer and the one contended for by the contractor. No specific direction as to Shag Rock No. 1 or Shag Rock No. 2 was given as to the order of their removal; the plural is used, “the smaller rocks.” The contractor elected to -commence work on No. 1, but by so doing it, can not be reasonably asserted he precluded himself from joint operations if the organization of his force and his interests, as well as the interests of the defendants, would be advanced thereby. His plans for the removal of both Shag Rocks had been submitted and approved by the engineer, and if the circumstances of the case and the situation of the parties at the time characterize the rulings of the engineer as an arbitrary and unreasonable exercise of his discretionary power under the contract the consequential loss is recoverable. (Collins and Farrel v. United States, 34 C. Cls., 294.) Taking specification 39 as a whole, and construing it in conjunction with the act of March 3, 1899, supra, it is clearly designed as precautionary rather than mandatory, its evident intent being to bring the contract within the terms of the enabling act, for the preliminary appropriation was not sufficient, to cover the entire undertaking, and the defendants were justly concerned in keeping the completed work within the limits of available funds to pay therefor. It is obvious that no particular order of removal of the rocks was indispensable; they were not contiguous; the language as to the removal of Arch Rock is clearly directory; the whole specification preceding, *550 as it necessarily did, the execution of the contract, was intended to comply with the intent of the Congress as expressed in the act of March 3, 1889, wherein it provided for supplemental appropriations from time to time as the work progressed. If the appropriation was available work might have commenced on Arch Eock without violating the contract. The contractor’s worldng organization included the employment, of skilled workmen, experts in the handling of drilling machines, and the employment of high explosives; to be compelled to use these men at ordinary labor at advanced wages when they could have been profitably employed occasioned loss. It was impracticable to discharge them after each blast and thus disorganize a systematic working force. The Engineer officer in charge can find no safe refuge in making this ruling by ascribing'it to a belated performance of the work on the part of the contractor, and a conjectural increase in price and additional difficulties in performance if the contractor failed in his undertaking, for he was manifestly requiring extra work of the contractor in the matter of depth of excavation and had unjustly and arbitrarily prejudiced the contractor’s ability to do the work before he had even commenced operations. The United States was in no position to suffer, but on the contrary to benefit by a contrary ruling. Not one dollar had at this time been paid the contractor, and none was asked for. One thousand cubic yards of rock were required to be removed monthly; the engineer officer knew this, and instead of facilitating operations and enabling the contractor to execute the contract by having blasted material immediately available for removal he compelled him to confine operations to the single rock until every vestige had been removed. The contractor was limited as to time and was entitled to some consideration, especially when he had exhibited a degree of industry and faithfulness not always manifest in contracts of this character. The defendants were amply protected from any failure of performance by a surety bond equal in amount to the first appropriation under the act of Congress. The amount claimed for the delay preceding work on Arch Eock must be disallowed. The refusal of the Engineer officer *551 having been ignored, the work proceeded and contractor suffered no loss thereby. Item 1 is allowed for $735.
Item 2: The claim under this item is found in Finding IX. Paragraph 44 of the specifications provided a means of making survey of the completed work upon which estimates were to be predicated. The claimant knew this was indispensable, and while the drilling was not done from scows or boats, he can not relieve himself from the obligation to furnish the same by the approval of a different plan prepared by himself and assented to by the engineer, in which no provision was made for a fixed point for surveys. The specification did not provide in detail as to manner and is clearly susceptible to the construction placed upon it by the engineer in charge. The specification was intended to provide for a fixed point for a survey of the work done at the expense of the contractor, and because' he did not elect to pursue the methods permitted by the specification, which he could have done, he can not now complain that in doing the work in a different manner he incurred additional expense. The item is disallowed.
Item 3: Finding X discloses the facts. This item will be allowed. It is inconceivable how it could be disallowed. The work required of the contractor was not included in the contract, specifications, or the contour lines of the blue prints. The existence of this rock, a separate and distinct formation, 80 feet distant from Arch Rock, was not known to any official or any other person concerned in the subject matter of the contract, and was never intended to be included in the contract price. The Engineer officer compelled its removal as a part of Arch Rock, and admits he would not have made final payment on Arch Rock until this extra rock had been removed by the contractor. The ruling was arbitrary. The evidence as to cost of removal varies in amount. The rock was not large nor the work on the contract unduly prolonged. A reasonable sum under all the circumstances is allowable, which we find to be $650.
Item 4: The claim under Finding XI involves two contentions, one of which is partly conceded by the defendants, and the other contested. Defendants admit, and it is incontrovertible, that a mistake was made by the Engineer officer *552 in charge in adopting a plane from which measurements were to be made to ascertain the prescribed 30 feet below mean low water, thus requiring the contractor to excavate to a depth of 1.2 feet in excess of that prescribed by the contract. The method of ascertaining the depth of excavation by the use of an improvised mechanism termed a catamaran is seriously questioned. The construction of the catamaran and the method of using the same is set forth in detail in the findings, as well as the objections to its accuracy.
The contract is silent as to a method of survey and leaves the determination of the question to the court upon the evidence in the record as to its reasonable fairness or unfairness. A careful analysis of the testimony discloses that the chief complaint of the contractor in the use of the machine goes more to the extensions, i. e., the 7 feet protrusion of the submerged horizontal rod on each end over the width of the machine above water. In other words, it is contended that the submerged rod was 1G feet longer than the width of the floating portion of the machine, thereby giving an increased depth to the measurements when the floating portion of the machine assumed changing elevations caused by the wind, the tide, and the shifting of the men in operating the same. No mechanical or any other explanation is offered for this manifest difference in length between the submerged rod and the main body of the contrivance, and it is apparent to even the unskillful that it served to increase the depth of the excavation. It would in effect be similar to straight rockers to a chair. Protruding, as they do, some distance from the body of the chair, they necessarily would protrude into a yielding substance to a greater depth when the chair itself was moved forward and back. The novelty of the contrivance is conceded, and just why the ordinary method of making soundings was departed from is not satisfactorily explained. The testimony establishes beyond question that under the existing conditions in San Francisco Harbor, as to violence of wind and waves, it would bo impossible under most favorable conditions to maintain any just degree of equilibrium in the piloting of a float of the dimensions of this mechanism, and it appears by the completion maps, exhibiting the depth to which the contractor was compelled *553 and did excavate, irrespective of the error of 1.2 feet in the establishment of a correct datum plane, that in every instance, taking into consideration several hundred points on the work, the contractor excavated to a depth varying from 31.6 to 37.5 feet, and in no single instance does a reading show a depth as small as 30 feet, and very few at 32. Some portion of this excavation might be accounted for by the admitted impossibility to obtain regular and certain surface below water where the rocks were disintegrated by the explosion of large charges of high explosives, a sequential average slightly below the requirements of the contract would be disallowed, but a substantial and inexplicable amount, totaling the sum of 8,012.18 cubic yards, moved by the contractor below the prescribed datum plane indicates an egregious blunder in the manner of measurements. The Coast and Geodetic Survey had ascertained and published the fact that mean low water was 1.2 feet above the mean of the lower low tides in San Francisco Harbor. This information was available and the proper depths easily ascertainable, but the engineer officer in charge compelled the contractor to excavate to a depth of 30 feet below mean lower low tide, adjusted the measuring devices of his catamaran accordingly, and made soundings from the catamaran which were necessarily erroneous because of the inability of the mechanism as a whole to produce accurate results. The claimant protested against the use of this device, but to no avail. The evidence as to its worth clearly preponderates in favor of the claimant and is not seriously contested. The item will be allowed for $84,127.89.
Item 5: The claim under item 5 is for interest paid by the contractor upon money borrowed to complete the work. The amount is not allowed under section 1091 of the Revised Statutes. A controversy similar to this was decided by this court in Myerle, exr., v. United States (31 C. Cls., 137) and also in McLaughlin & Co. v. United States (36 C. Cls., 186).
Item 6: Finding XIII. The contract, as usual, contained a provision for charging the costs of supervision and inspection against the contract price in the event of an extension of the contract. We need not cite authorities to sustain the proposition that where it appears that the delay is chargeable to the defendants, or caused by them, the charge can not be sus *554 tained. The findings show that the contractor was compelled to remove over 8,000 cubic yards of rock over the amount required by the contract. This is of itself sufficient to sustain the claim under this item. ■ Finding VI augments claimant’s contention to a material extent, disclosing an absolute prohibition against an orderly and systematic procedure toward celerity of performance. Finally the prevalence of storms and rough water, an ever-present preventive to speed in the performance of work of this character in San Francisco Harbor, and especially excepted in the contract, caused the delay in performance, which was obviously excusable, and additional time willingly granted. The actual sum of $2,133.83 was withheld when it should have been paid. The amount will be included in the judgment.
The last finding of the court is sufficiently explicit to speak for itself. We need not elaborate upon it further. The finding is the result of careful consideration of all the testimony in the récord, and, after careful deliberation, received the unanimous approval of the court.
Judgment is awarded the claimant in the sum of $81,646.22. It is so ordered.