DowNex, Judge,
reviewing the facts found to be established, delivered the opinion of the court.
The plaintiff company, on the 14fch day of June, 1907, contracted with the United States, represented by Maj. C. A. F. Flagler, Corps of Engineers, as the contracting officer, for the erection of a foundation for a lighthouse on the Elbow of Cross Ledge, in Delaware Bay, by the erection, sinking, and filling with concrete of a metal caisson, for the sum of $44,000, the work to be completed on or before November 1, 1907. •
The metal plates, braces, beams, etc., entering into the construction of the caisson were to be furnished by the United States at Christiana Light Station, or some other point mutually agreed on, where the contractors were to assemble the caisson to the top of the sixth row of plates, launch it, tow it to the site, sink it to a depth of about 6 feet 3 inches below the surface of the shoal, excavate the working chamber and fill it with concrete, assemble the additional courses of plates, fill the caisson with concrete, and otherwise complete the work as required by the drawings and specifi *185 cations. The structure and size of the caisson, a full understanding of which is necessary to a proper conception of the case, is described in detail in the findings of fact, and reference may be had thereto, so that it need not be repeated here. There are many other matters of important detail set out in the findings with which we will not burden this opinion except as reference to them may be found necessary during the discussion of the case.
The specifications provided for the sinking of the caisson at a site to be selected by the agent of the lighthouse engineer in charge but to be upon the shoal known as “ Cross Ledge” and upon that part of the ledge known as the “ Elbow of the Ledge,” and stated that—
“In 1904, when a test boring was made, the top of the shoal was found to consist of a very hard stratum of sand. In this stratum of sand the foundation is to be sunk about 6 feet 3 inches.”
The Elbow of Cross Ledge was somewhat irregular in shape but was approximately three-eighths by three-quarters of a mile in its dimensions. A boring had been made in 1904 for the purpose of locating this lighthouse and marked by a buoy and a plat thereof made, but for some reason the lighthouse was not then built. When, in 1907, it was determined to proceed with its construction, agents of the engineer in charge were sent to locate the selected site, but. the buoy had disappeared and the pipe used in making the boring, could not be located by sweeping the ledge. The site was then located as nearly as could be by taking bearings with instruments on other points, but the site thus selected varied somewhat from the location of the boring in 1904. Because of the fact that in sinking the caisson the pipe used in 1904 was not encountered it was concluded that the circumference of the selected site did not include the former boring, and, on the other hand, the engineers were of the opinion that maximum allowances for errors in turning their angles indicated that the selected site could not be more than 70 feet from the former boring.
■ But whatever distance the selected site may have been from the boring of 1904 — and the exact distance does not seem to be at all material — it developed soon after the selec *186 tion of tbis site that the materials composing the ledge at the selected site were different from those indicated when the 1904 boring was made. Suspicions were first aroused when the plaintiff’s engineer and superintendent, in July, 1907, began driving piling at the selected site for the erection of a working platform. Suspicions were so confirmed by the driving of additional piles that, after conferences between the plaintiff’s engineer and the representative of the defendants’ engineer in charge, the facts were, by the former, communicated to the proper officers of the plaintiff company and, by the latter, to Maj. Flagler, who ordered another boring to be made. This boring, of which the plaintiff’s representative had knowledge, and the details of which are shown in the findings and not repeated here, developed materials different from those shown by the boring of 1904.
It was also demonstrated afterwards, during the sinking of the caisson and the excavating of the work chamber, that the materials were different from those indicated by the boring of 1904, but they were then found to be substantially as indicated by the second boring made in the early part of August, 1907, by direction of Major Flagler.
When the report of this latter boring was received by Maj or Flagler he wrote the plaintiff, on the 28th day of August, before the caisson had left the point of assembly, stating that the recent boring showed a much harder material at a depth of about 8 feet 6 inches than at a depth of 6 feet 3 inches, that this might prove to be entirely local, that if the entire foundation at 6 feet 3 inches should be found soft he would likely call on them to sink the caisson to a greater depth, that he would probably be able to make an inspection and decide the point when a depth of 6 feet 3 inches was reached, but that their agent in charge should be instructed to go deeper if directed by him or one of his agents. There was correspondence, referred to in the findings, in which the plaintiff requested to be informed as to additional compensation for going to a greater depth “ if you instruct us to do so,” but there was no agreement reached as to the compensation in that event and no instruction given,to go deeper. After the caisson had been placed in position and loaded, and within a few days had'sunk from 2 to 3 feet, there was another conference, sought by the plaintiff, with Major Flagler, the *187 details of which are to be found in the findings and need not be repeated here, but which resulted in no agreement as to compensation for sinking below contract depth and in no instruction so to sink.
The plaintiffs seek recovery in a considerable sum upon the ground, generally stated, that the conditions encountered in sinking the caisson were different from those represented in the specifications and that by reason thereof they were put to additional expense in the amount claimed, and they seek also recovery of $720.83 deducted on final settlement, by the United States, as expense of superintendence, etc., during the period of delay after the time provided for the completion of the contract. They allege in their petition in support of their right to recover that the caisson could not be stopped at the contract depth, and that it had to be sunk to a greater depth to insure a stable foundation, and that it was so sunk under the supervision and direction of the agents of the United States, and that it was sunk to a greater depth by direction of the engineer officer in charge, and that no suitable foundation was found until it had been sunk to a depth of 9 feet 8 inches.
A careful reading of the findings in all their details, together with a fairly adequate conception of the character of the contract undertaking, would seem necessarily to indicate the basis of the conclusion reached and to preclude any necessity for discussion, but it is perhaps best to remove any possibility of doubt by stating, as briefly as may be, the view taken of the case.
The statement in the specifications as to the character of the shoal, as indicated by the boring made in 1904, has been set out. It might be necessary to consider the extent to which the plaintiffs were entitled to rely on that statement and the extent to which, if at all, it was to be regarded as in the nature of a warranty but for the fact that consideration of such questions are eliminated by findings that it was impracticable for bidders to make borings for themselves and that the United States intended that they should rely on the information given and the further fact that the site selected did not exactly coincide with the site of the boring where it was first intended that the lighthouse should be located.
*188 It is noticeable that while the petition more than once alleges results “by reason of the soil or bottom proving and being vitally and materially different from that which had been previously represented and warranted unto your petitioner by the said contract and specifications and by the representatives of the United States,” it is also alleged in the petition “ that a new test boring was made ” and “ that such new test boring disclosed and confirmed the fact that the said bottom or soil as actually encountered was not, in fact, a hard stratum of sand as had been represented and warranted to your petitioner, but that the said soil or bottom as actually encountered consisted in the main of slippery and difficult mud without the presence or existence of the hard stratum of sand represented by said specifications.” And it is peculiarly noticeable, so far as the proofs are concerned, that while plaintiff’s engineer and superintendent, testifying on recall in 1913 with reference to what he regarded as the excessive sinking of the caisson during the first few days, said, “ We had expected to find a hard sand bottom,” he had, in 1911, testified about driving the piles for the working platform, beginning on the 17th of July, 1907, and that his suspicions were at once aroused as to the character of the bottom and that as pile driving progressed the way they drove “ caused us to suspect that the bottom was not all hard sand.” Plaintiff’s counsel, in his original brief, citing the testimony both of plaintiff’s and defendants’ engineers in support thereof, says: “ The resistance encountered in driving these piles was in places so slight and also so irregular as to lead to the belief that there was no uniform bottom of hard sand, as stated in the specifications.”
It is found that when the plaintiff’s engineer, Prescott, had his suspicions aroused by the way the piles drove, he called the matter to the attention of the defendant’s engineer, Bedford, who was present on the work; that Bedford himself observed the conditions; that they consulted about the matter; that each reported the conditions observed, Bed-ford to Map Flagler and Prescott to the president of plaintiff company some time yet within the month of July; that another boring was ordered and made of which Prescott had knowledge at the time and saw some of the samples of mate *189 rials encountered; after which Maj. Flagler wrote the plaintiffs a letter in which he referred to the recent boring and the fact that it indicated a harder surface at 8 feet 6 inches than at 6 feet 3 inches, and stated that, while this condition might preve to be local, if the whole bottom at 6 feet 3 inches proved to be soft he would likely call on them to sink the caisson deeper, a matter which he would determine when the contract depth was reached. This letter called forth an inquiry from plaintiffs as to compensation for sinking the caisson an increased depth “ if you instruct us to do so,” and there was, as shown, a conference later on, after the sinking of the caisson had commenced, at which the plaintiffs were seeking an arrangement by supplemental contract as to compensation for sinking the caisson below the contract depth. The discussion at all times was confined to that question, and plaintiffs at no time made any objection to proceeding with the contract under the ascertained changed conditions, and at no time made any question as to increased compensation for the sinking of the caisson to the contract depth. Not only charged with knowledge but actually having knowledge of changed conditions long before they began the sinking of the caisson, they did not protest against proceeding with the work under the original contract and ask modification thereof or elect to rescind and assert their rights, and they must be deemed to have waived any claim on account of the ascertained changed conditions so far as the sinking to contract depth was concerned.
Among the many definitions of waiver we find, perhaps, most frequently, “ A relinquishment of a known right,” and, more definitely applicable here, “ An implied consent by a failure to object.” Discussing the effect of misrepresentation in the inducement and the right of recission, it is said in Page on Contracts, Yol. 1, sec. 154,
“ If a person to whom a misrepresentation as to a collateral fact is made, subsequently learns the truth and with full knowledge of the facts elects not to rescind, he thereby waives his right to rescind and elects to ratify the contract.”
It is well settled that a waiver need not be in express terms, but it is sufficient if it may reasonably be inferred from the things said or done, with knowledge of the facts. By his *190 acts or omission to act one may even waive a right which he has under the Constitution of the United States. Pierce v. Somerset Ry., 171 U. S., 641. Proceeding with the contract after knowledge of changed conditions, without protest or assertion of right to additional compensation, would seem to be sufficient, but it is materially strengthened in this case by the fact of lengthy discussion by the plaintiff’s as to extra compensation for proceeding beyond the contract depth, necessary, as they claimed, because of changed conditions, with no suggestion of any claim on account thereof as to the contract depth. Mere silence, under some circumstances, may operate as a waiver.
In Ferris v. United States, 28 C. Cls., 382, the plaintiff had entered into a contract for the dredging of a channel at a stated price per yard, and after beginning the work found that the materials to be dredged were different from those stated in the notices to bidders. He called the attention of the engineer to the matter and asked for additional compensation and, being referred to the assistant engineer he stated to him that he must have additional compensation or would withdraw his machinery from the work, and the assistant engineer promised him additional compensation and he proceeded with the work. The case turned upon the fact that the original contract provided -that any change or modifica-tiqn must be evidenced by a contract in writing which must be approved by the Secretary of War, but Judge Weldon, in his able opinion in the case, said:
“When it was ascertained by the claimant that the material contemplated by the contract was essentially different from the material to be dredged, it was his duty, if he did not wish to proceed with the execution of the work, to so notify the officer with whom he had contracted and get from him by the sanction of the proper parties such changes as could be agreed upon.”
The cases are not numerous in which the question of a waiver is presented just as it is in this case, and the reason therefor is apparently to be found in the fact that in the majority of such cases reaching this court, and we have many of them, the contractors, upon discovering changed conditions have protected themselves by protests and de *191 mands for additional'compensation, or have abandoned tbeir contracts. While tbe prevailing practice does not establish the law, it indicates the generally accepted view of the law on the part of those having to do with such matters.
In Simpson v. United States, 31 C. Cls., 217, where the question involved was similar, the plaintiffs contracted to build a dry dock on an “ available site,” selected by the United States, and during the progress of the work quicksand was encountered entailing large additional expense. They asked extension of time on account of the unforeseen difficulties encountered and relief from penalties, but, without other demand proceeded with the work. Their demand for additional compensation followed the completion of the work and it was held that they could not recover. This court likened the case to that of Ferris, supra, and quoted from the opinion therein as we have done above. The Supreme Court affirmed the case (172 U. S., 372) on the conclusion that there was no warranty as to conditions to be encountered, and hence was not called upon to determine the question of a waiver, but in the opinion significant reference is made to the fact that—
“ It is not pretended that, when the character of the subsoil was discovered, the slightest claim was preferred that this fact gave rise to an extra allowance. The fact is that the contractors proceeded with the work, obtained delay for its completion, made its final settlements and received théir last payment without ever asserting that any of the rights which they now claim were vested in them.”
In Sanger & Moody v. United States, 40 C. Cls., 39, material only on one point, the contractors at time of final settlement reserved claims for extra work and for losses occasioned by delay in work, and the court said:
“These were the only claims asserted by the claimants when the final payment was made under said last contract, and what was not then claimed the court may fairly presume was waived.”
In the instant case the principle is clearly applicable to the conduct of the plaintiffs when they were negotiating for compensation for sinking the caisson to an additional depth, made necessary, they asserted, by the character of materials *192 of which the shoal was composed, and made no claim to any additional compensation for going the contract depth.
In Lewman v. United States, 41 C. Cls., 470, there is a collation of authorities and a deducing of principles with reference to the rights of contractors under various circumstances, among which is found the principle that an abandonment of a contract is justified when there is required the performance of “ a thing different in substance from that which was contracted for.”
In E. & I. R. R. Co. v. United States, 82 C. Cls., 555, the plaintiff was under contract to carry the mails from Evansville to Washington and, based upon a weighing, the compensation had been fixed at $42.75 per mile. The route, by order of the Postmaster General, was extended from Washington to Worthington, with notice that the compensation would be adjusted in accordance with law. A weighing over the whole route from Evansville to Worthington was / ordered “ for the purpose of obtaining the data upon which to adjust the pay in accordance with the several acts of Congress governing the same,” etc. This weighing showed average weights of mails carried over the whole route which, under the usual rule as to adjustment of compensation, entitled the carrier to $56.43 per mile. This increased rate of compensation was applied to the portion of the route as extended from Washington to Worthington but not to the portion between Evansville and Washington, and the carrier continued to carry the mails without protest. The court said:
“ The failure of the company to protest because the order of readjustment, after the weighing as aforesaid, was not made to apply to the compensation between Evansville and Washington, and no demand having been made therefor, it must be held that the company not only assented to the rate as originally fixed for carrying the mails between Evansville and Washington, but assented to a continuance of such rate during the term of its contract, thereby construing its own action as favorable to the rate fixed.”
In the instant case we may well inquire what the situation would have been as to a claim for additional compensation for sinking the caisson to the contract depth had the plaintiff *193 and Major Flagler agreed, as they attempted to do, upon a compensation to be paid for sinking to an additional depth, if it should be directed, and entered into a properly approved supplemental contract with reference thereto without any provision modifying the original contract as to compensation for sinking to the contract depth. The negotia-' tions were the same and to us seem to be of the same effect as if that result had been accomplished. The only reason why it was not accomplished was that they could not agree upon the compensation to be paid for the additional depth, and compensation therefor, if directed, was left to future adjustment. It seems hardly worth while to pursue the authorities further.
With reference to the sinking of the caisson below the contract depth, there are allegations in the petition, referred to above, to the effect that it was so sunk under the supervision and direction of the agents of the United States and that they were directed by the engineer officer in charge to sink it to a greater depth. All the work was of course under the eye of an inspector representing the engineer officer in charge. It was not under the supervision of the agents of the United States, if that word is used as meaning direction as to methods, and not only is the allegation that it was sunk to a greater depth by direction of the engineer officer unsupported by the evidence but it appears from the facts and the findings that the direction of the engineer officer was to the contrary. We understand that theory of the case to be abandoned by the plaintiff, since it was not contended in argument that Major Flagler or any of his assistants directed the sinking of the caisson below contract depth and we are not asked in requested findings so to find. But aside from that it conclusively appears not only that there was no direction to go below contract depth, but that Major Flagler concluded before contract depth was reached that the bottom at that depth would furnish a satisfactory foundation and so notified plaintiff.
It may be here suggested that there were good reasons why it was not desirable to sink the caisson below the contract depth. It was to constitute, when completed and filled, the *194 foundation for a lighthouse. The necessary elevation above the waters at high tide and above the waves in time of storm and the desired elevation of the light were all matters of importance and which had been fixed, in the preparation of the plans, on the basis of a sinking of 6 feet 3 inches below the surface of the shoal. A greater depth of sinking disarranged these plans, and it appears in the record that in fact the plan of the superstructure had to be modified in order to get the light into its proper focal plane.
One other theory which permeates the plaintiffs’ case may well be disposed of before proceeding to the consideration of other matters. Plaintiffs allege in their petition that the caisson had to be sunk deeper than the contract depth to insure a stable foundation, and that no stable foundation was found until it had been sunk to a depth of 9 feet 8 inches, and much effort is given to proof of the proposition that the bottom at 6 feet 3 inches did not furnish a suitable and a safe foundation. The error of the plaintiffs is in attempting to arrogate unto themselves an authority and a responsibility which unquestionably belonged to the engineer officer in charge. There was no obligation on the plaintiffs to guarantee the stability of the completed work, and if they had completed their work according to contract at the contract depth, determined by Major Flagler to be satisfactory, there could have been no responsibility on them if thereafter, by reason of unstable bottom, the caisson had sunk out of sight. It was not, as is frequently the case, a contract under which the contractors were obligated to produce a result for which they were responsible, and the determination of the suitability of the bottom on which the caisson should rest did not belong to them.
Apparently conceding that they were not directed to sink the caisson beyond the contract depth, the theory, aside from that just stated above, is that because of the character of materials encountered and their difference from those to be anticipated from the statement in the specifications, it was impossible to stop the sinking of the caisson at the contract depth or until the depth was attained at which it finally rested, and that, therefore, the expense attendant on the sinking to the increased depth was the result of the fact that *195 the materials encountered were different from those represented by the specifications on which they had a right to rely.
Clearly they had no right to rely further on the specifications after they had been fully informed that the materials to be encountered were different and that the “ harder ” materials would not be encountered until they had attained a depth of 8 feet 6 inches, but apparently they had sufficiently protected themselves in the matter of their right to claim additional compensation if they should be directed to go below the contract depth. Incidentally, in this connection, it may be suggested that if responsibility as to a stable foundation rested with them, that fact, under all the circumstances, would raise a serious question as to any right to additional compensation for going any required additional depth in the accomplishment of the contract obligation. But, to resume, not having been directed to go any additional depth, but, according to their theory, having gone that additional depth because the changed character of materials made it impossible to stop the caisson at the contract depth, it might, if that fact were proven, require consideration of the question as to the effect of foreknowledge of the changed conditions unaccompanied by any protest against proceeding under or demand for any change in the original contract on account thereof. But we do not find it necessary to consider that question or in any wise to base our conclusion on its solution, because we have concluded and have found that it was possible to have stopped the caisson at the contract depth. This is the finding of an ultimate fact which no doubt precludes the necessity of any discussion, but it seems fitting that the basis of the conclusion should be stated.
It is self-evident that the rapidity with which the caisson would sink was dependent largely on the load which it carried aside from its own weight. The buoyancy of the water was a counterforce, ■“ skin friction,” not of much moment in this case because of the shape of the caisson, was another, the accumulation of materials in the working chamber before they were excavated was another and potent one, and, after excavating commenced, compressed air was another. Loading of the caisson was presumably necessary to some extent to cause it to settle and, according to plaintiffs’ theory, it *196 was necessary to give it stability so that it might safely withstand the tides, winds, and waves. If the materials in which the caisson was being sunk were very hard and compact it is evident that a heavier load and possibly earlier excavation would be required to cause it to settle. If soft, a lighter one would serve the purpose so far as sinking is concerned. We will refer to the question of necessary stability in its relation to load later on. When such a caisson has sunk as far as the available load would carry it against the resistant forces and particularly against the accumulation of materials in the working chamber, or to any depth at which for any reason it is desirable to begin excavating the working chamber, air is pumped into the working chamber, access being had through air locks in the air shaft. The primary purpose of the air is to drive the water down put of the air shaft and to the cutting edge of the working chamber so as to free it of water, and excavation may be by buckets which pass up through the air locks or more frequently, as in this case, by the use of a blowpipe through which the materials to be excavated are blown out by the force of the air. Assuming that a caisson with the materials in place in the working chamber has sunk as far as it will sink with the then load, it is apparent that when the resistance of the materials in the working chamber is removed by their excavation the caisson will again sink unless some other support is provided, and for this purpose the customary practice is to use blocking or cribbing or posts set on blocking and extending up against the ceiling of the working chamber.
With reference to the load carried by the caisson in this case and the continued additions thereto at a time when it seems there should have been no added weight, the findings are in detail. When towed to the sight the caisson, very heavy of itself, had some concrete in it and drew 22 feet of water. It was to be sunk in a depth of approximately 24 feet. When anchored at the proper place water was pumped in until the cutting edge rested on the bottom, when it was twisted into proper position and "water pumped in up to the level of the water outside, a height of water in the caisson of *197 17 or 18 feet above the ceiling of the working chamber, a platform was built across the caisson at the bottom of the sixth course of plates and loaded with broken stone, and the work of adding the remaining three courses of plates was commenced. It sank somewhere from 2 to 3 feet within a few days, and the plaintiff’s engineer, who testified, in 1913, that “ we had expected to find a hard sand bottom ” thought that the distance the caisson had sunk with the then load indicated “ that the bottom could not really be hard sand,” and that the matter was “ serious enough that it should be brought to the Government’s attention.” We must judge of the credibility of the witnesses as well as all facts bearing on the question of the plaintiff’s right to recover, and we must consider this witness’s statements and any motive therefor, in the light of the facts testified to by him in 1911, already stated, as to his discoveries when he was driving the piles for the working platform in July, his report of conditions to his superiors, an'd subsequent happenings.
It is not only interesting but very material to note the procedure on the part of plaintiff’s superintendent after he had reported the rapid sinking to the president and vice president of his company and, with one of them, had had an interview with Maj. Flagler in an effort to get a contract with reference to compensation for sinking to an additional depth. This interview was on September 13, one week after the caisson had been first placed in position. On the 14th the water was pumped out and on the 15th the placing of concrete in the caisson began. The caisson had apparently remained stable over the night of the 14th-15th without either water or concrete in addition to that therein when it was towed to the site, but the placing of some concrete was no doubt entirely proper. But, aside from days when work was stopped because of lack of cement or stone or coal or water, or because of storms, concreting continued with more or less expedition until the 19th of October, when the concrete was up to the middle of the fourth course of plates, the third course above the working chamber, a depth of concrete of about 15 feet and a weight of concrete of approximately 1,100 tons. During all of this time, nearly five weeks from the time concreting began, the load on the caisson was being constantly added *198 to and the caisson was continuing to sink, although there was no material of consequence excavated until after the 12th of October and after the caisson had reached a depth of more than 4, plaintiff’s superintendent says 5, feet. Air had been put on on the 4th, but only for a few hours; another boiler had to be procured and air was not again put on until the 12th and no excavating done until after that day. When loading ceased on the 19th the caisson was 5 feet or slightly more down with very little material excavated from the working chamber. It continued to sink, and when Maj. Flagler made his final inspection on the 27th it was nearly 6 feet down, no effort by usually accepted methods had yet been made to stop it, and, strange to say, on the day that Maj. Flagler made that inspection and indicated that the bottom at contract depth would be satisfactory, more concrete was put in the caisson. It is found, and is not to be successfully questioned, that no preparation was made before it reached the contract depth to stop the* caisson at that depth, but, on the contrary, in the face of continued sinking, the load was continuously added to until it had gone down 5 feet or slightly more on the 19th. Ordinary judgment would seem to dictate that adding to the load should have ceased long before that time, and that preparations should have begun for stopping the caisson at the required depth. The contention of the plaintiff is .that the load put on the caisson was necessary to stability and safety. Let us consider this contention.
Into the consideration of the contention stated several elements may enter. It was necessary, no doubt, to preserve the stability of the caisson. It was necessary also to sink it. It was equally necessary, under the contract, to stop it at the contract depth, hold it there, excavate the working chamber, and fill it with concrete. Stability by weight added was required to the extent necessary to overcome buoyancy and exert a continuing downward pressure. So far as the sinking was concerned it is apparent that when a superimposed load would no longer cause the caisson to sink with the materials in the working chamber in place, the excavation of those materials would relieve the counter force and sinking would again result. But if stability was in all cases to be *199 attained by weight only it may readily be conceived that under some circumstances the attaining thus of stability would seriously interfere with other parts of the work. It is to be remembered, first, that this caisson did not stand alone, exposed to all the elements. There had been erected on piling a large working platform, 55 feet square, sufficiently stable to carry machinery, boilers, materials, and a considerable building, occupied as a warehouse and living quarters for the men employed, and there had been cut out of one side of this platform a crescent-shaped place to receive the caisson. It could certainly be given much of support from this platform. The average layman might have some difficulty in understanding why guy lines might not be attached to anchors, or if not feasible to anchors, then to piles driven for the purpose, and if he feared to suggest such a crude procedure, he might find support in the provision in the specifications that “ guide piling may be used to set the caisson in position or to delineate areas of riprap deposit, but will not be required. If used it must be rempved before completion of the work.” But it is not necessary to conclude that such methods should have been resorted to. There is in the record and in the findings conclusive proof that, depending solely for stability on weight, with such incidental protection as may have been afforded by the working platform, there was much more concrete put in the caisson than was necessary not only to meet ordinary conditions, but to withstand severe storms.
Sufficient of detail is shown in the findings to indicate that high winds and storms were of not infrequent occurrence during this period, and also to show the height of the concrete in the caisson at such times. On September 21 the concrete was at the top of the second course of plates, the first course above the work chamber, or 6 feet in depth of concrete. Only small amounts were deposited on the 22d and 23d, the supply of cement being exhausted on the 23d. Work was interfered with on the 22d by a storm. If the concrete was above the 6-foot height it was only so by the amount put in that day. There was a heavy storm on the 23d. Then the concrete had been raised above the 6-foot level only by the amount of the deposits of the 22d and 23d, which it is safe *200 to say did not amount to more than a foot, probably not so much. No more was added on the 24th or 25th, and on the latter day there was a particularly heavy storm. It is not necessary to follow like details further. The storms interfered with the work, but did not disturb the caisson. From the testimony of plaintiffs’ superintendent is deduced the statement in the findings that the loads were always heavy enough to counteract the force of the Avind, and that interference with the work during storms was not because of effect on the caisson, but because of effect on the scows and platform and facilities used. Aside from these statements by Mr. Prescott the record contains no suggestion or any statement from which an inference can be drawn that these storms ever disturbed the caisson in any degree. But with this conclusive evidence of its stability even in storms, with less than half the concrete therein which was finally placed, evidence much more conclusive than the testimony of witnesses, they continued to add concrete until it sank 5 feet, and, according to Mr. Prescott, it was down that 5 feet before they commenced air work, and, following this statement, he complacently attributes alleged inability to stop the caisson at 6 feet 8 inches to the fact that “ there was no bottom there strong enough to carry the weight which we were putting upon it.”
The whole situation considered in connection with such a theory as to why the caisson could not be stopped at the contract depth presents so much of absurdity as to justify passing without further comment. If the bottom at the point where by the contract they were required to stop the caisson was not strong enough to carry the weight which they were putting upon it, why, in the absence of necessity, conclusively shown, were they putting that weight on? And in considering the situation we must bear in mind the conditions attendant upon the sinking of the caisson and the result necessarily to be accomplished. They had loaded it and continued to load it until it had sunk 5 feet before the air was put on; in other words, it had sunk 5 feet against the resistance of all the accumulated materials in the working chamber which was a “ conical frustum ” with sides nearly 45 *201 degrees from the perpendicular. They knew this material must be removed, and that when removed its supporting power was gone and other support, sufficient to hold the caisson, must be substituted. It could not be expected to stop when resting on the cutting edge alone without other support. And the support necessary was largely dependent on the weight to be supported. And yet, with full knowledge of the result to be attained under the contract, not yet in any manner modified, they not only put on this excessive load but they erected no supports in the working chamber before the contract depth was reached. It will not do, in the face of this procedure, to assert that the bottom at 6 feet 3 inches was too soft to support the caisson.
In the argument of this case it was attempted to make it appear that loading to this extent by the placing of concrete in the caisson, and indeed to a greater height than was placed, was required by the contract. Such a contention finds no support either in the contract itself or in the specifications. There was no requirement that, in relation to other parts of the work, loading to any stated height was required at any particular time. And along that line it may be observed that Maj. Flagler never gave any directions as to the loading of the caisson. On the contrary, he always declined to instruct in any way as to methods, stating that the responsibility was with the contractors. There is a provision in the contract with reference to the filling of the caisson to the top of the sixth course of plates, but it is a provision fixing the time, in its relation to the progress of the work, of the first payment on the contract price and has no other force. It provided that one-third of the contract price would be paid “ when the caisson with six or more courses is sunk in position at the site with concrete filling to the top of the sixth course and one-half of the riprap deposited.” The words “with six or more courses” plainly meant six or more courses of plates. The second payment was to be made when “ the caisson is sunk to prescribed level in its final position and the concrete filling completed.” Reading the two provisions together, it is apparent that the contract fixed the time of the first payment by the time when the caisson should be filled with concrete to the top of the *202 sixth course of plates and that if, sunk in position, it was so filled before “sunk to prescribed level” the first payment would be due, although not yet sunk to the prescribed level, and it is reasonable to assume that, under some conditions, it might be proper or even necessary to load to that height before the prescribed level was reached, but the provision is dealing wholly with the time of payment and does not in any manner assume to direct the sequence of the work. If explanation is to be sought as to why the plaintiffs proceeded as they did with this work, one, among others, might be assumed to be found in a desire to push forward that part of the work which would mean their right to receive one-third of the contract price. It is not material to the case, but it appears from the record that, by supplemental contract made in November, the plaintiffs were paid the first one-third of the contract price after the work in the working chamber was completed and before the fifth and sixth courses of the caisson were concreted.
If the work had been carried on as common prudence dictated, in the light of the contract obligation to sink the caisson to a prescribed depth, it seems apparent that it could have been-stopped and finished at that depth. We have so found. That finding, together with the finding that there was no direction to sink it to a greater depth, necessitates a conclusion against the plaintiff’s right to recover by reason of the additional depth. We are not called upon to decide what the plaintiff’s rights might have been had the conditions, different from those represented in the specifications, necessarily prevented the stopping of the caisson at the contract depth.
The findings with reference to delays preclude a recovery . of the amount deducted for expenses of superintendence and like expenses during the period of delay. We have not found ' it necessary to burden the findings with detailed statements as to the numerous delays in the work for which the United States was in no way responsible. If there was any delay in going to the contract depth because of materials being different from those represented in the specifications, what has been said with reference to compensation on account thereof applies. There was never any application for extension of *203 the contract period by reason of the ascertained changed conditions. What has been said on the other branch of the case is also applicable to this item. There is an attempt in the record to show at what date, subsequent to the contract date of completion, the work might have been completed if the materials had been as represented in the specifications. This is purely speculative, but, in view of the conclusion reached on other grounds, immaterial.
The plaintiff is not entitled to recover and its petition should be dismissed.
Judgment will be entered against the plaintiff for the cost of printing the record in this 'cause in the sum of $1,062.95.
Hat, Judge; BaRnet, Judge; Booth, Judge, and Campbell, Chief Justice, concur.