Booth, Chief Justice,
delivered the opinion of the court:
The plaintiff, as executor of the estate of J. D. Young, deceased, brings this suit to recover the various sums hereinafter mentioned, predicating the legal right to do so upon the decedent’s relationship with the United States during the periods involved.
September 10, 1924, J. D. Young contracted in writing with the United States to dredge the channel of 'an old canal between Moss Bluff Bridge and the mouth of Silver Springs Bun, in Florida. The consideration to be paid Young was $50,000, and the work was to be performed in accord with the terms of the contract and detailed specifications.
A portion of paragraph 15 of the specifications, upon which plaintiff relies as to the first item in suit, is as follows:
* * * The quantity of material to be removed from within the finished channel lines, as shown on the drawing referred to in paragraph 16 post, is estimated to be 216,000 cubic yards, but the United States does not guarantee the accuracy of this estimate, nor the accuracy of the drawing-in respect of the depth and location of the cuts, and, should *172 it develop in the course of the work that the estimate or the drawing, either or both, are not entirely accurate, neither party to the contract will make a claim against the other on account of any such inaccuracies, but both parties to the contract will be bound by the intent and purpose of the specifications as above described.
The specification estimate of 216,000 cubic yards was admittedly a mistake upon the part of representatives of the War Department, they having made an error with respect to levels to be followed, which imposed upon the contractor the necessity of excavating 297,081 cubic yards of material, or an excess quantity of 81,081 cubic yards over the estimate.
Plaintiff proves that the reasonable value for dredging the above quantity of material is $26,351.32, i. e., at the rate of 32% cents per cubic yard, and for this sum judgment is sought, upon an alleged implied contract to pay for the same on the basis of quantum meruit.
The first important question is whether such a cause of action is available to plaintiff. The petition contains no allegation of breach of contract, no charge of misrepresentation or the withholding of information upon the part of the defendant. All that is alleged and established by the record is the fact that an error was made in the drawings of and by the defendants to which the contractor was entitled, and which when corrected caused the contractor to excavate under the contract a large quantity of material in excess of what he otherwise would have had to do.
The subject matter of the contract involved was manifestly dredging. The area to be dredged, and the depth, width, and length of the channel were approximately specified, and the contractor not only entered upon performance, but continued work under the contract and the supervision of defendant’s officials acting as inspectors and contracting-officers. The fixed consideration for the contract was paid the contractor, less the retained percentages, and accepted. To now insist that the contractor’s rights are determinable as though no express written contract for the work claimed for existed, is, we think, untenable. Pharr v. United States, 62 C. Cls. 445; Klebe v. United States, 263 U. S. 188; Hawkins v. United States, 96 U.S. 689; Ceballos & Co. v. United *173 States, 214 U. S. 47; Keystone Structural Co. v. Link-Belt Co., 270 Fed. 705.s
The remaining vital issue is whether the plaintiff may recover for this item under the written contract set forth in the findings. We might well assume, in view of the allegations of the petition and plaintiff’s contentions thereunder, that defendant’s liability under the written contract is nonexistent. However, our rules of pleading exact consideration of the facts as established and alleged in the petition, irrespective of plaintiff’s application of the same.
Plaintiff seeks to escape the legal consequences of assenting to paragraph 15 of the contract by attributing to the words therein “are not entirely accurate” the limitations usually ascribed to the use of the phrase “more or less”, and contends that a deviation from the estimated quantity of material tó be dredged, extending to five or six per cent of the same, is all that is allowable or intended.
The argument is not convincing from a purely legal aspect. Obviously if the estimated quantity of material to be dredged had greatly exceeded the quantity essential to conform to the drawings and grades therein given, the contractor would nevertheless have been entitled to the $50,000 consideration for the undertaking.
The contract in suit was let to plaintiff’s decedent when he submitted his bid therefor in pursuance of a public advertisement soliciting bids for performing the specified work. The advertisement estimated the quantity of material to be dredged at 260,840 cubic yards. The written contract contained the following express provisions:
3. Quantities approximate. — It is understood and agreed that the quantities given in these specifications are approximate only, and that no claim shall be made against the United States on account of any excess or deficiency, absolute or relative, in the same. No allowance will be made for the failure of a bidder or of the contractor to estimate correctly the difficulties attending the execution of the work.
4. Errors and omissions. — The contractor will not be allowed to take advantage of any error or omission in these specifications, as full instructions will always be given should such error or omission be discovered.
*174 Paragraphs 15 and 16 are parts of “Detailed specifications.” Paragraph 16 reads as follows:
16. Drawing's. — The work shall conform to drawing marked “Oklawaha River, Florida, Survey made Jan. 31st to Feb. 15th, 1924, for estimate of material to' be removed to provide 5-feet water from Moss Bluff to Silver Springs Run” file marked 6298-114. The lines and grades to be followed are shown on the profile and sections on this drawing by broken lines marked “Grade line B.” This drawing forms a part of these specifications and is filed in the TJ. S. Engineer Office at Jacksonville, Florida.
So far as the quantity of material to be dredged is concerned, the contractor was advised three times that it was only estimated, and no guarantee as to accuracy or as to quantity obtained, and, in addition, positive provisions of the contract warned the contractor that the United States would not be responsible for errors, omissions, or the entire accuracy of the drawings setting forth the work to be performed. The language of the contract in this respect could not be more explicit.
It is apparent, we think, that when the parties to the contract considered its provisions, and especially paragraph 15 of the specifications waiving claims for inaccuracies in the drawings, etc., and assented to “be bound by the intent and purpose of the specifications as above described”, they fully understood that the contract work was of such a character as to preclude the possibility of predetermined accuracy as. to details, that errors and omissions were likely to be encountered in the estimates and drawings, and no intent and purpose existed with respect to their correction in any other way than that provided for in the contract. The waiver of claims for inaccurate drawings was mutual.
The plaintiff relies upon the following cases: Hollerbach v. United States, 233 U. S. 165; Axman v. United States, 47 C. Cls. 537; Christie v. United States, 237 U. S. 234; United States v. Atlantic Dredging Co., 253 U. S. 1; United States v. L. P. & J. A. Smith, 256 U. S. 11.
The principle of law applied in the above cases was-predicated upon misrepresentation of existing conditions, which misled the contractor to his injury. Information *175 as to the character of materials to be dredged, the nature of the soil and difficulties attendant upon the prosecution of the work in the possession of the defendant, was withheld, and knowingly misleading drawings submitted to the contractor, which resulted in the imposition upon him of additional and increased cost of performance incapable of ascertainment and anticipation from the drawings and plans submitted.
Work outside and not provided for by the contract which the contractor is compelled to perform under threat of withholding payments for work done, or arbitrary, unjust, and capricious construction of contracts and final decisions of contracting officials, supplies a basis for relief where established. Acemam ease, supra. In this case, however, the mistake made was an honest one. It is not charged otherwise. The error complained of crept in after performance of work under the contract began. The contractor did not at any time protest nor make a claim for extra or additional work, but continued the excavation operations in accord with the adopted plans for accomplishing the completion of the channel. Trimount Dredging Co. v. United States, 80 C. Cls. 559.
No evidence exists indicating that the contractor at any time made an independent examination to ascertain conditions incident to the performance of the contract work, notwithstanding the several provisions of the contract which expressly cautioned against omitting such a procedure.
Where a contractor enters into a written contract to perform a specified work for a lump sum consideration and the contract and specifications place upon him the responsibility for the work, and relieve the United States from liability for inaccurate estimates or drawings, performance of the contract in accord with its intent and purpose is cast upon the contractor, and the court is powerless to relieve him when subsequent events disclose increased costs of performance and unforeseen difficulties always integral with such an undertaking. Nelson Co. v. United States, 261 U. S. 17; Lustbader Construction Co. v. United States, 62 C. Cls. 549; Monad Engineering Co. v. United *176 States, 53 C. Cls. 179; Maryland Dredging Co. v. United States, 241 U. S. 184.
Paragraph 13 of the specifications is as follows:
13. Payments. — Payment of the full amount due on the hourly rental basis, for dredging cut-offs and passing basins and for delays caused by navigation, will be made each month. Payments for work under the lump sum price of $50,000 will be made monthly for such parts of the channel as were completed during the preceding calendar month, at the rate of 23% cents per cubic yard of material removed from the net channel section, as estimated from the sections shown on the drawing referred to in paragraph 16, but 20% of the amount due will be deducted each month and retained until completion of the contract. The total payments for work, other than that executed on the hourly rental, will not exceed $50,000, including retained percentages.
Retained percentages amounting to $9,469.27 were withheld from the contractor under the above paragraph. We think the amount retained is recoverable. The contract contained provisions authorizing the contracting officer to resort to two methods of compensating the United States in the event the contractor delayed performance of the work or did not attain the standard of progress essential to complete it on time. One was after ten days’ notice to the contractor that the United States would put on an additional plant or purchase additional materials and charge the extra cost to the contractor, and the other to take over the contractor’s plant and complete the work.
The contracting officer did not resort to either of the methods mentioned. On the contrary, no sums of money were charged against the contractor for whatever occurred subsequent to his discontinuance of work, and there is no proof in this record that the defendant suffered any loss from the contractor’s conduct, or, so far as the defendant is concerned, did not complete what was exacted under the contract. The deduction made has simply been withheld by the defendant and not applied on any extra costs as contemplated by the contract.
The defendant also withheld $1,147.08 as expenses of inspection and superintendence alleged to be attributable to delays occasioned the contractor because called upon to ex *177 cavate the large amount of excess material over the estimated amount of 216,000 cubic yards. It is difficult to perceive the justice of this action. The defendant made the mistake which caused delayed performance, but the contract contains no provisions which warrant the charge of inspection and superintendence to the contractor. This sum was withheld by the defendant under paragraph 12 of the specifications, whereas, if any such sum could have been withheld, paragraph 20 of the specifications alone provides for cost of inspection, and is as follows:
20. Subsistence for cmd assistance to inspectors. — The contractor will be required to furnish suitable subsistence to not exceeding three inspectors, the cost of same being included in the lump sum bid. The contractor shall also furnish, on request of the inspectors, the use of such boats, boatmen, laborers, and material forming a part of the equipment and crew of the dredging plant, as may be reasonably necessary in inspecting and supervising the work, provided the operation of the dredges will not be materially interfered with thereby.
The record supplies no proof that the sum withheld is attributable to the contractor’s delay under this paragraph,, and the same should and will be included in the judgment. It requires proof to justify withholding sums due a contractor; a mere statement of the fact and citation of contract provisions are wholly insufficient.
DEFENDANT’S counterclaim
Finding 4 discloses the Congressional authority conferred upon the Secretary of War to grant a permit to J. D. Young “to construct an extension to certain improvements from Morrison Landing to Starkes Ferry or Lake Griffin, in accordance with plans recommended by the Chief of Engineers.” Young, in consideration for the permit, was to convey to the United States the land occupied by the proposed extension, which he did, and in addition prosecute the work under the detailed plans submitted by the Chief of Engineers.
The plans formulated by the Chief of Engineers contained three optional propositions, and Young elected to accept the *178 one set forth in paragraph (a) of the permit to be granted, and known as the second alternative. It reads as follows:
By the building, on the river side of the canal, of a dike of proper width and height to be maintained by and at the expense of the permittee who shall be responsible for all damages that may accrue by reason of the flooding of adjacent lands, and who shall protect the United States against any suits brought by persons claiming to have been damaged by such flooding.
The written permit contained various specifications for performing the work contemplated. The one here involved pertains to an alleged failure on the part of Young to construct a dike of proper width and height, and to maintain the same on the river side of the canal, the defendant contending that because of this failure the United States was compelled to do what Young should have done, at a cost of $37,594.62. An additional expense of $1,890.49 for constructing a bulkhead near Moss Bluff Dam, incurred by the United States, is also charged against Young on the theory that under the terms of the permit it should have been constructed by him.
No controversy obtains over the fact that under the permit Young failed in certain particulars to construct and maintain the dike as he was obligated to do. We say this advisedly, for plaintiff admits an indebtedness to the United States of $4,860.90 incurred in making repairs to and strengthening one break in the dike. This admission, we think, leaves one remaining question and that is as to the liability of Young under the permit for the repair of additional imperfections in the dike. The solution of this question revolves around two written agreements, one entered into June 26, 1928 (Finding 9), between Young and the United States, and the other dated August 3, 1928, between the United States and Des Bochers and Watkins Towing Company.
The agreement of June 26, 1928, evidently embraces an adjustment and settlement of the issue of the repair, strengthening, and enlargement of the dike. Young, unable to proceed and still in a beneficial status in the event the dike was repaired, strengthened, and enlarged, grants *179 the United States the right to enter upon his lands adjacent to the dike and deposit thereon such fill as may be necessary in its enlargement, etc., the United States, in view of the dike’s inadequate cross section, etc., to do this work at its expense.
When this agreement was executed, the officials of the United States knew of two breaches in the dike for the repair of which Young under his permit was responsible, but in addition to this these same officials were aware of the dike’s inadequate cross sections — a defect of vital concern to navigation. In order then to procure without cost the rights granted to the United States an obligation was assumed by the United States to repair the breaches in the dike and enlarge the same at its expense.
The contract of August 3, 1928, with the Des Kuchers and Watkins Towing Company was obviously executed by the United States to comply with the obligations assumed in the contract of June 1928, and under the terms of this contract the United States paid the contractor $37,594.62. This contract did expressly provide as follows: “For closing two breaches in and enlarging the cross section of the dikes along the Oklawaha Kiver near Moss Bluff, Florida.”
For more than one reason it is our opinion that defendant’s counterclaim as to this item is not sustainable. In the contract of June 26, 1928, the United States for a valuable consideration took over the performance of the work therein mentioned. Manifestly, it was to the interest of both parties to that contract to do precisely what they obligated themselves to do. The existing situation on the date the contract was executed disclosed that the intended purpose of the undertaking had not been accomplished, not due primarily to any breaches in the dikes but to inadequate cross sections and imperfections not anticipated when the terms of Young’s permit were formulated.
The United States could not utilize Young’s lands without his permission, and without such permission the dike could not be enlarged. If the undertaking remained in statu quo serious consequences as to its usefulness were apparent, and to carry forward and accomplish what Congress intended, the contract of June 26, 1928, was executed. At least 96,000 *180 cubic yards of material and possibly more, out of a total of 101,249 cubic yards dredged and disposed of under the Des Rochers contract, were used to enlarge the cross sections of the dike and widen the canal. California, Bridge & Construction Co. v. United States, 245 U. S. 337.
Another outstanding inducement for the contract of June 26, 1928, is the proved fact that after Young had finished his work upon both the canal and dike, and prior to the time the United States had determined the dike to be insufficient in some particulars, the flood conditions around Lake Griffin were materially altered by the United States. Obstructions in the vicinity of Haynes Creek were removed, with the result that the flow of water from Lake Griffin to Lake Eustis was greatly increased, finding its way into Young’s canal, a contributing factor toward causing the breaches complained of and obviously necessitating enlarged cross sections of the dike.
The second item of defendant’s counterclaim is for the sum paid by it to construct a bulkhead near Moss Bluff Dam to protect the canal near the point where the same was constructed. We think this item is disposed of by the facts set out in Finding 13.
The plaintiff is entitled to judgment for $5,425.46, the court allowing plaintiff to recover the following two items in suit: $9,469.27 and $1,147.08, a total of $10,616.35. The defendant’s counterclaim is sustained as to two conceded items, viz, $4,860.90 and $329.99, a total of $5,190.89, leaving $5,425.46 due the plaintiff. It is so ordered.
Whaley, Judge; Williams, Judge; Littleton, Judge; and Green, Judge, concur.