## CHARLES NELSON COMPANY *v.* UNITED STATES.

### APPEAL FROM THE COURT OF CLAIMS.

No. 287. Argued January 25, 26, 1923.—Decided February 19,
1923.

A contract for furnishing lumber to the Government at a specified
price contained a clause obliging the contractor to deliver any
quantities ordered in a certain period irrespective of the estimated
quantity named in the contract. *Held* that the contractor, in
furnishing lumber in excess of that quantity and in accepting the
contract price therefor without protest, knowing that the Government was relying on the contract, waived his right to insist that the
clause was void for lack of mutuality and could not recover the
difference between the contract and higher, market prices for the
excess so furnished. P. 19.

56 Ct. Clms. 448, affirmed.

APPEAL from a judgment of the Court of Claims.

*Mr. William E. Humphrey* and *Mr. William C. Prentiss*
for appellant.

*Mr. Alfred A. Wheat,* Special Assistant to the Attorney
General, with whom *Mr. Solicitor General Beck* was on
the brief, for the United States.

MR. CHIEF JUSTICE TAFT delivered the opinion of the
Court.

This is an appeal from a judgment of the Court of
Claims dismissing the petition of the plaintiff, the Charles
Nelson Company, after a hearing of the evidence and
upon findings made. The plaintiff was the lowest and
accepted bidder upon advertised solicitation of the Navy

Department for the furnishing and delivery of lumber at the Puget Sound Navy Yard for a period ending December 31, 1917. This suit is to recover the sum of $20,321.33, the amount with interest of the difference between the market value and the price bid upon what the plaintiff claims was an unjust excess over and above the amount of lumber it should have delivered and that which at the insistence of the Navy Department it did deliver.

The bids were opened January 3, 1917. The contract was signed February 23, 1917. Thereby the plaintiff agreed to furnish and deliver f. o. b. alongside wharf, navy yard, Puget Sound, lumber of certain kinds in such quantities and at such times during the period ending December 31, 1917, as the supply officer of the Navy might direct. "All deliveries to be made promptly and orders of 50,000 ft. b. m. or less of assorted sizes, not more than 10,000 ft. b. m. of any one size, except with the consent of the contractor, must be delivered within 10 days after receipt of order. All other orders must be delivered within 25 days after date of receipt of order from the supply officer." The contract contained this provision which was evidently taken from the form of bids solicited:

" It shall be distinctly understood and agreed that it is the intention of the contract that the contractor shall furnish and deliver any quantities of Douglas fir which may be ordered for the naval service at the place named during the period ending Dec. 31, 1917, irrespective of the estimated quantity named, the Government not being obligated to order any specific quantity of Douglas fir contracted for."

Then follows:

"Class 5—Continued.
Stock Classification No. 39.

Fir, Douglas, as follows:

1. 1,675,000 feet b. m. (about), of such sizes or grades as may be ordered—per M feet."

The Navy Department on orders placed by it before December 31, 1917, received from the plaintiff 3,688,259 feet b. m. of Douglas fir. The amount furnished above 1,675,000 feet was worth at market price, delivered at the navy yard, $18,310.21 more than the plaintiff was paid therefor at the prices bid and accepted.

After the execution of the contract and as a development of the World War the Government entered upon the building of submarine chasers at this navy yard, a type of vessel never before built there, and much of the lumber required of the plaintiff under its contract was used in the construction of these vessels.

The plaintiff denies that the writing signed by it was a binding contract, because there was no mutuality of obligation. The Government answers this by citing the case of *United States* v. *Purcell Envelope Co.*, 249 U. S. 313. In that case the Post Office Department invited bids " for furnishing stamped envelopes and newspaper wrappers in such quantities as may be called for by the department during a period of four years, beginning on the first day of October, 1898." The bid of the Purcell Company was accepted. The formal contract was signed by the Company and bond given. Subsequently the Postmaster General refused to sign this contract, and bought the envelopes and wrappers elsewhere. This Court held that the acceptance of the bid made the contract, that the words above quoted must be construed to mean that the Company should furnish all the envelopes and wrappers of the specified sizes which the Department would need during the four years' period, and that the Government was as much bound to take the envelopes and wrappers as the bidder was bound to furnish them. Heavy damages for the breach of the contract were awarded against the United States. But it is to be observed that there was in the contract or invitation for bids no express denial of the obligation of the Post Office.

Department to take the envelopes in that case, so that the question of a lack of mutuality did not arise in the *Purcell Case* as it does here.

But we are not obliged definitely to pass upon the question whether the instrument relied on by the Government constituted a contract binding on the plaintiff for the whole amount ordered at the price bid, because under the findings of the Court of Claims, the plaintiff must be held to have waived any right to claim more than the price it bid for any part of the lumber it furnished.

The findings show that the plaintiff did not furnish the lumber itself but relied on two so-called subsidiary companies to do so. The manager of one of the companies, the Crown Lumber Company, was Scott. He was also a stockholder and officer in the plaintiff. Scott received an order for 1,675,000 feet b. m. of lumber from the plaintiff to be delivered to the navy yard. In May, there was delay in deliveries by the Crown Lumber Company of which the navy yard commandant made complaint to the plaintiff by telegram, to which plaintiff replied referring the commandant to Scott. Having delivered 950,000 feet, and accepted orders in addition thereto of 1,186,000 feet, Scott on May 21st, wrote to the navy yard supply officer calling attention to the fact that the orders received unfilled were for 1,186,000 feet whereas there were only 725,000 feet due on the original contract for 1,675,000 feet, and asking him to say which of the orders he wished to withdraw. It appeared that Scott was not then advised of the terms of the contract. The supply officer replied quoting from the contract the clause quoted above, refusing to withdraw any orders and insisting on fulfillment of all orders issued and to be issued. A copy of the letter was sent to plaintiff at its office in San Francisco. After further correspondence in which the supply officer threatened the plaintiff to buy in the open market against its account, the Crown Lumber Company by

Scott, June 7th, accepted another order "under protest, especially as to delivery date." On June 11th, Scott accepted another order "under protest." On June 26th and July 2nd he accepted other orders "under protest, especially as to delivery." In June, Scott and Jackson, vice-president of the plaintiff, held a conference with the supply officer at the navy yard to discuss the failure to keep up with the deliveries as the Government needed them. During this conference Scott again protested at being compelled to deliver any more than 1,675,000 feet at the contract price. The supply officer stood upon the contract and made no promise to pay more than the contract price. Scott testified that in spite of the letter sent him by the supply officer, he did not know, until the next September, the terms of the contract except from the insufficient memorandum of order sent him by the plaintiff company soon after the contract was signed. The Court of Claims finds that it did not appear that Scott was directed by the Company to make such a protest as at the June meeting or that he was acting within his authority in so doing. On June 18th, the plaintiff company wrote the supply officer as follows:

"Dear Sir: Contract 28942. We have for acknowledgment your letter of the 14th, in which you transmit instructions received from the Bureau of Supplies and Accounts, Navy Department, Washington, D. C., in which you are instructed as follows:

"'Contract 28942, if contractor fails to make delivery, purchase authorized as requested.'

"May we be permitted to state that it has never been our intention or aim to fail to make delivery of your requirements as we may be committed to under the contract above quoted? Mr. A. A. Scott, our resident agent on Puget Sound, has been instructed to give your business the right of way, both at the Mukilteo and Port Angeles plants.

"Mr. H. W. Jackson, our vice president, was on the Sound recently, and he states that at both mills nothing is left undone in order to produce the lumber that you have ordered under the contract.

"By way of further explanation we might say that when we entered into this contract with your department we never dreamt that we would be expected to deliver extraordinary quantities of clear lumber of long lengths, such as planking, decking, etc., within the time limits specified in the contract. In connection with these orders we feel that we are entitled to some consideration and a little leniency. The contract itself states that we are committed to making deliveries on your orders 50 M feet per B. M. or less of assorted sizes, not more than 10 M feet B. M. of any one size except with the contractor's consent, which must be delivered within ten days after date of receipt of order, and that all other orders must be delivered within twenty-five days after date of receipt of order from the supply officer. Therefore we submit that when you order 100 M feet of decking or ship lumber of long lengths and ask us to furnish same within ten days you are requiring more of us than is specified in the written contract.

"For this special material, if you were to buy this in the open market to-day, you probably would penalize us $10.00 per M. We feel sure that it is not the desire of your department to arbitrarily penalize us to that xtent, in view of the fact that we are doing our utmost to execute your orders within the time limits.

"We feel that we are not responsible for the extraordinary conditions which have arisen since the contract was executed. We are reliably informed that the War Department has canceled their contracts and is now redistributing their requirements, having in view existing conditions. We also feel that your department should interpret our engagement in the same way. We trust you

will accept this communication in the spirit in which it is sent. We are not asking to be relieved of any responsibility, but rather we submit the facts with a view of enlisting your cooperation to assist us in completing our engagements."

The Court of Claims further found that "no protest against furnishing more than 1,675,000 feet of lumber under the contract was ever made by the plaintiff company itself or any of its officers," and the VII finding was as follows:

"The plaintiff company furnished to the defendant on orders placed by the defendant under contract 28942, 3,688,259 feet of lumber, for which it was paid at the contract price, and it did not at the time of any payment make to the United States any protest against payment at that price, and so far as the United States was informed such payments were accepted as in full.

"The amount of lumber furnished over and above 1,675,000 feet was worth at market price, delivered at the navy yard, $18,310.21 more than the plaintiff was paid therefor at contract price."

On these findings we can see no escape for the plaintiff from acquiescence by its conduct in the price bid for the whole amount of lumber delivered.

The plaintiff relies on the opinion of this Court in *Freund* v. *United States*, 260 U. S. 60. The facts of that case are very different from this. They involved conduct on the part of the representatives of the Government of questionable fairness toward the contractors and showed no such acquiescence and absence of protest as here appear.

It may be as counsel suggest that the plaintiff's course was influenced by a patriotic wish to help the Government when it was engaged in war. If so, it was to be commended. But this can not change the legal effect of its evident acquiescence seen in its letter of June 18th

and its failure to protest thereafter and to put the Government on notice that it intended to claim a recovery on a *quantum valebat* when it was delivering the extra two million feet of lumber and receiving the payments therefor from the Government at the prices named in the bid. The judgment of the Court of Claims is

*Affirmed.*