Graham, Judge:
While concurring in the conclusion reached by the court, I wish to express my view of the case.
On October 15, 1917, and for some time prior thereto, the plaintiff owned the steamship Willicum O’Brien. On October 12 the United States Shipping Board sent a telegram to the Huron Navigation Co., in care of the Cosmopolitan Shipping Co., which was duly received, and which was as follows (see Finding YI) :
“ The United States Shipping Board hereby gives notice to all owners of ships registered or enrolled under the laws of the United States that the requisition of all American steamers described below, and of which previous announce *803 ment has been made, will become operative and effective on October 15, 1917, at noon.”
Then follows the statement that all ships of not less than 2,500 tons total dead weight, including bunkers, water, and stores, are covered by this notice, and “ as to all steamers in or bound to American ports on October 15, 1917, requisition becomes effective at noon, October 15, 1917, and accounts for hire and expenses will be adjusted from time steamer began to load,” and further,
“ Owners whose steamers are operating in their regular trades are to continue the operation of their steamers for the account of the Government as they have been doing for themselves until they receive further instructions,”
and
“ Owners whose steamers are chartered to others will apply to the Shipping Board for instructions regarding future employment of said steamers.”
On October 15, 1917, plaintiff, through its agent, the Cosmopolitan Shipping Co., acknowledged this telegram, as follows:
“ We are in receipt of your telegram, and also Mr. Ewing’s favor of October 13, giving notification to American vessels as of October 15. We understand from the terms of your notice that, in so far as the same relates to the S. S. William O’Brien, now booked for cargo for the French Government and miscellaneous consignees at Havre, France, that this vessel is to proceed with her loading without regard to this notice, and for your information would state that all cargo has been ordered delivered to the vessel, which is due to arrive in New York within the next day or two. If our understanding of your instructions is incorrect, kindly advise us.”
On October 19 the United States Shipping Board sent the plaintiff the following telegram, which was received:
“ You are authorized to proceed with the loading of the William O’Brien for France for Government account in accordance with requisitioning order.”
On the same day the plaintiff acknowledged this wire, as follows:
“We have pleasure in reporting to you the safe arrival of the S. S. William O’Brien at New York this afternoon.
*804 “ We also acknowledge receipt of your telegram of even date reading as follows:
“ ‘ You are authorized to proceed with the loading of the WilMam O'Brien for France for Government account in accordance with requisitioning order.’
“Every effort will be made to give this vessel a prompt dispatch.”
The S. S. ’William, O'Brien arrived in New York and completely discharged her incoming cargo on October 19 and, in accordance with the above order of the Shipping Board, was reloaded with the cargo already contracted for and left the port of New York for Havre on October 24. In a letter to the Shipping Board dated October 24 the plaintiff st ated: ■“ The S. S. O'Brien sailed from New York to-day for Havre.” In a letter of the same date to the Shipping Board plaintiff said:
“ Complying with your instructions, as follows, ; Government assumes war risk, effective from time vessel is subject to requisitioning order, value of vessel to be determined at time of loss ’—
“We have ordered the S. S. O'Brien to proceed to sea as you have directed.”
In this letter was a protest against not insuring the vessel for an estimated value of $1,650,000. Replying to his communication, the Shipj)ing Board, on October 31, wrote the plaintiff the following letter, which was received:
“Replying to your communication of October 24, we note that the decision of the Shipping Board in regard to the •determination of value at the time of loss is not satisfactory to you, and we wish to advise that this is the final decision •of the board covering all vessels operating under the general requisitioning orders.”
The steamer proceeded on its voyage to Havre, carrying mo war-risk insurance, and arrived there and finished discharging its cargo on November 19, 1917. On the afternoon •of that date, after its cargo had been discharged, the steamship was taken over by General Pershing, on the “ bareboat ” basis, for duty as an Army transport, together with her •crew, supplies, and stores.
The history of further operation of this ship while under Government control after November 19 will be discussed hereafter.
*805 The letter of October 16, 1917, above quoted, from plaintiff’s representative to the Shipping Board contains this statement:
“We understand upon the completion of the vessel’s inward voyage after October 15 she goes under charter to the United States Government. The charter rate per ton per month would be $6.25. What we wish to know is, Are we to draw up a charter with the United States Government? If so, for what period of time and what form of charter is to be used ? ”
This whole letter is set forth in Finding VII.
On October 13 the Shipping Board, referring to the telegram of October 12, supra, wrote the plaintiff a letter which contains the following:
“Inclosed please find confirmation of this message, together with general statement covering schedule of proposed rates.” (Finding YI.)
Beceipt of this letter Ava.s acknowledged on October 15. On October 16 plaintiff replied further to this letter and quoted the language above with regard to the charter rate. This schedule of “ proposed rates ” mentioned in the above-letter of the Shipping Board was a schedule fixing two rates on what were termed “time-form” and “bare-boat form.” Under the “ time-form ” the rate named varied with the tonnage of the vessel. In the case of plaintiff’s vessel the rate was $6.25 per dead-weight ton per month for cargo ships such as plaintiff’s. Under the “bare-boat form” the rate was based iipon speed, up to and including 11 knots, the rate being $4.15 per dead-weight ton per month, and for each knot or part of a knot over 11 knots, 50 cents per deadweight ton per month. Under the “bare-boat form” the Government paid all expenses of operation, including the hire of the crew, and assumed all risks, whereas under the “time-form” these were paid and assumed in greater part by the owner of the vessel, and were to that extent covered by the “ time-form ” rate of $6.25that is to say, this rate covered both hire and part of the expenses of operation, the Government taking the risk of gain or loss on the voyage as well as the risk of the loss of the ship, the gross earnings to go to the Government.
*806 When plaintiff’s vessel sailed from New York, as far as the record shows, the same officers and crew were aboard the ship who operated it prior to its passing under Government control on October 15, 1917, and they continued to operate it throughout the voyage to Havre. The plaintiff during that voyage supplied all things necessary for the operation of the ship, and it was the understanding of the parties, and it is so stated in the charter contract, which was executed subsequently by the parties, that it was to be operated upon the “ time-form ” basis; that is, $6 25 per gross ton per month.
After ariving in France on November 19, it was taken under his control by General Pershing, on the “ bare-boat ” basis, and thereafter operated upon that basis by agreement between the parties, and plaintiff presented all of its bills thereafter at' the “ bare-boat ” price of $4.15, mentioned in the said sch' dule of rates. Plaintiff on this voyage realized the gross sum of $682,684.20. From this it deducted its operating expenses, $98,788.98, leaving a balance of $583,-895.22.
So it will be seen, stated succinctly, that what transpired here was that the Government gave plaintiff an order for the use of its ship at a price named, which order was accepted on the basis of the “ time-form ” rate, and the ship voluntarily delivered into possession of the Government in pursuance of this acceptance without protest or reservation as to the rate named, and thereafter the vessel remained under the control of the Government. After the termination of the voyage to Plavre, as stated, by agreement between the parties the vessel ivas operated on the “ bare-boat ” form rate. Plaintiff regularly thereafter rendered its monthly bills at that rate.
We have, then, an order for the delivery of material at a price fixed, acceptance of the order and price, and voluntary delivery of the material. This constituted a contract and not a taking by the right of eminent domain. See American Smelting & Refining Co. v. United States, 259 U. S. 75; Federad Sugar Refining Co. v. United States, ante, p. 184; and Consolidation Coal Co. v. United States, *807 ante, p. 608. The Gulf Refining Co. case, 58 C. Cls. 559, 579, has been much discussed in the briefs of counsel for both parties. As to this case, it is only necessary to point out that plaintiff there refused to accept the rate named by the Shipping Board after the ships had passed under Government control, and distinctly reserved the price to be paid as hire. As to its other ships allowed by the Government to remain in its possession, and which it operated for its own account, it accepted the rate named by the Shipping-Board, and sought in the suit to recover on account of these latter ships more than the accepted rate; but the court held that having accepted the rate it was bound by it and could not assert a claim upon any other basis than the rate named and accepted.
In the case of Willard, Sutherland & Co. v. United States 56 C. Cls. 413, 422, the plaintiff on demand of defendant furnished coal in addition to the amount called for by its contract, and under protest as to the price, reserving the right to recover the difference between the price and the market value. This court said in that case:
“ The defendant demanded the coal under the contract and the plaintiff furnished the coal. * * * The plaintiff’s right was to refuse to deliver the coal in response to the demand made.”
In the same case the Supreme Court (262 U. S. 489) in affirming the decision of this court stated:
“ It [plaintiff] must be held voluntarily to have accepted the order for the additional 1,000 tons and to have furnished it at the price specified in the contract.”
In Nelson Co. v. United States, 56 C. Cls. 448, 457, the court said:
“ Having furnished additional quantities in compliance with orders specifically predicated on the contract, it can not, while complying with such orders, create or preserve by so-called protests a right to additional compensation over and above the contract price.”
This case was affirmed by the Supreme Court (261 U. S. 17) upon the above principle.
Prior to the outbreak of the war in Europe, and to June 3, 1916, the date of the passage of what was known as the *808 national defense act (39 Stat. 166, 213), section 3709 of the Revised Statutes required all contracts to be made by advertising for bids, except in case of an exigency, when the formality could be omitted. And so in a number of early cases in this court it was held that where goods were purchased in an exigency without the formality of advertising for bids or even the formality of a written contract, and the Government received and used the goods, the acceptance by the Government and use of the material were a waiver of the requirements of the statute, and good faith required that it should pay for it on an implied contract; and where an exigency ivas shown to exist it ivould be held on the contract.
At the time of the passage of the national defense act this Government was not at war but ivas preparing for any emergency that might arise. The method of advertising for bids and executing formal contracts necessarily involved delay. It was thought desirable to supplement this by another and swifter method of purchasing and procuring supplies, and so the method was provided by the act of June 3, 1916, in addition to the methods authorized by sections 3709 and 3744 of the Revised Statutes. The President by the act was authorized, “in addition to the then authorized methods of purchase and procurement” through the formality of advertising and signing contracts, “to place an order ” for materials through such agencies of the Government as he saw fit; and in order to be sure that the desired materials would be promptly secured, and possibly as an incentive to acceptance and compliance with the order, it was further provided that if the party refused or failed to comply with the order the President could seize the materials or plant. A taking by right of eminent domain Avas only to be resorted to in case of the failure or refusal of the party to accept or comply with the order and furnish the materials. The term “ to place an order ” has a well-known significance in business. A person places an order Avith a manufacturer of goods at a certain named price. If the order is accepted or the goods are delivered it is an enfor-cible contract, and the manufacturer can recover the price. In other words, the placing of an order is an offer to purchase goods at the price named, and if the offer is accepted *809 or the goods furnished to and accepted by the vendee, it becomes a contract enforcible in law.
In the national defense act it will be noticed, as confirmatory of this view, that this language is used: “ * * * in addition to the present authorized methods of ■purchase or procurement,” the President was authorized “to place an order ”; that is to say, it was desirable to depart somewhat from the then authorized method of purchase, which, as stated, was by advertising for bids and executing formal contracts. The President could proceed to purchase by simply placing an order. But, further, it will be seen that it at as contemplated that in placing the order he should name a price, and so the act further on provides that if the party to whom the order is given shall “ refuse to furnish * * * at a reasoftable price to be determined,” the President is authorized “to take possession of his plant.” The term “reasonable price” left the matter of purchase price to be offered discretionary with the President, as well as the terms and conditions upon which the goods were to be supplied, as it also left within his discretion the form and substance of the order to be given in each case.
Obviously, when an order had been given under authority of this statute for the purchase of materials, the terms named and price fixed therein, and the price accepted or the order complied with and material delivered without formal acceptance, and received by the United States, there came into existence a valid contract under the authority of this statute, a contract which was enforceable in the courts and binding upon both parties alike. The expressions heretofore quoted, “ in addition to the present authorized methods of purchase or procurement,” to “to place an order at a reasonable price to be determined by the President,” and the right to take by virtue of eminent domain in case of refusal, are contained in all of the subsequent acts, including those of March 4, 1917, June 15, 1917, and July 1, 1918. These acts, in some minor particulars not pertinent to the question here, are different, but the authority of the President to make a legal contract by placing an order under certain terms and conditions without the formality of advertising for bids or formal contracts is the same, as is the *810 purpose to secure by this method the purchase by contract of the materials and to make the acceptance of the order and the delivery of the goods, where no objection has been made to the price, a contract binding upon both parties.
That the parties understood that the ship had passed under Government control as of October 15 is evidenced by the weekly reports of plaintiff to the Government after that date; the request for permission to load the cargo and the inquiry as to how the charter contract should be drawn; the acceptance of the statement of the Government, in answer to the plaintiff’s inquiry, that the boat would be operated on this voyage on Government account, and the authority givén to take on the cargo for the voyage to Havre with this understanding; the assumption of risk or loss by the Government during the voyage; the subsequent request by the plaintiff for permission to pay out of the net proceeds of the voyage on -the purchase price of its vessel; and the giving of a bond in which it is stated that this date is fixed as the date upon which the vessel passed under control of the Government.
The' earnings of the ship after it passed under Government control belonged to the Government and must be accounted for by plaintiff. Gulf Refining Co. v. United States, supra. The ship, as stated, passed under Government control as of October 15, the date fixed in the requisition notice. It arrived in New York on its return trip from voyage No. 3 on October 19 and began to load its cargo on that date, so that on this latter date it passed into actual possession of the Government and began loading its cargo on Government account, as stated in a letter to plaintiff heretofore quoted.
The plaintiff is therefore entitled to be paid for the hire of the ship from October 19 to November 19, the date when General Pershing assumed control of the vessel on the basis of the “time-form” rate of $6.25 per dead-weight ton per month. The hire for this period has been found to be $46,487.50. See Finding XXII. From November 19, 1917, to February 21, 1919, the date on which the ship was returned to the plaintiff, the latter is entitled to be paid on the “ bare-boat ” basis of $4.15 per dead-weight ton per month, *811 $465,073.34. See Finding XXII. It is also entitled to be paid the sum of $37,914.49, collision charges (Finding XXIX) ; also $8,882.93 (see Finding XIII), being the sum expended for repairs while the vessel was in Government control after November 19, 1917; and the sum of $13,774.92 (see Finding XV) for stores and provisions on board when General Pershing assumed control of it on the date just named; and $13,219.25 (see Finding XY), being the difference between the sum of $17,000 agreed upon as an allowance to the plaintiff for reconditioning the vessel after it was returned to it and the value of Government stores left on the vessel at the time it was redelivered. This makes a total due the plaintiff of $585,352.43 in an accounting with the defendant.
As against this sum there is due from plaintiff to defendant $583,895.22, being the net receipts from the voyage to Havre, and also the sum of $1,794.87 on account of advances for gun mounts, etc. (see Finding XVI), making a total of $585,690.09 due from plaintiff to the Government on an accounting.
The parties afterwards entered into a charter contract, copy of which is found in Finding XVII. There were a number of letters written in regard to this charter, but, briefly stated, it was executed by plaintiff, who had inserted the date November 19, 1917 (when General Pershing took possession of the vessel), as the date when the vessel went into the control of the United States, and from which hire was to be computed. On March 13 this charter was returned by the Shipping Board’s representative in a letter to the plaintiff stating, as in previous letters, that the date November 19 was not the date when the vessel passed under the control of the United States, but that the date was October 25; that the date October 25 had been inserted as the date when the vessel passed under the control of the Government, and that with this change the charter had been executed on behalf of the United States. The charter so corrected was received by the plaintiff, and it does not appear that any objection was made at that time to the change in date when the vessel passed under Government control. As was said by *812 the Supreme Court in the American Smelting & Refining Co. case, supra:
“ We have said nothing about repeated requests that the claimant should sign a formal contract, its refusals, and its ultimate signing under protest, because these facts in no way modify the relation of the parties under the contract by letters already made.”
Apparently the fixing of this date, October 25, as the date when the vessel passed under the authority of the United States was an error. It has been found that the vessel passed under the control of the United States on the 15th of October. The bond prepared by the United States and later signed by the plaintiff fixed October 15 as the date when the vessel passed under control of the Government.
The charter also fixed the rate of compensation, on the basis of “time form,” at $6.25. The court has found that by agreement and understanding between the parties after November 19, 1911, the vessel was to be operated on the “ bareboat ” form, and it was upon this basis that the plaintiff regularly rendered its bills for payment after that date. Plaintiff seems to contend that the alteration by the Government in the date when this charter became effective, after the plaintiff had executed and returned it with notice of the change, renders the charter ineffective. This question does not, we think, affect the conclusion reached on the relation of the parties under the original contract. If the charter contract is valid as delivered by the Government to the plaintiff with the changed date, it confirms fully the view heretofore presented as to the preliminary contract between the parties by the acceptance of the order and the delivery of the vessel into the control of the United States as of October 15,1917. If the charter contract was not valid, then the case stands upon the original order, its acceptance, and the delivery of the ship.
The plaintiff in its request for findings states:
“ With the exception of the alteration of the date at which the vessel would enter the pay, the said form of charter was correct as signed by the plaintiff ”;
*813 that is, presumably it embodied the original agreement and understanding between the parties for the hire of the vessel, and that there was such a contract.
Much of the confusion and subsequent debate in this case grows out of a misconception of the act of the Government,, through General Pershing, in taking physical possession of the William O’Brien when it was in the port of Havre in France on November 19,1917. Now, whether it was a taking or a contract, its status was fixed as of October 15,1917, as a Government-controlled ship; that is, the Government had control of it either by reason of a taking or by reason of a contract with the owner. After that date it is entirely immaterial what some other agent of the Government might, have done with regard to assuming control of the vessel.. The subsequent act of another Government agent can not alter the status of the vessel as a Government-controlled vessel from and after October 15, 1917, when the requisitioning: order became effective.
We may therefore disregard, in the consideration of this case, the acts of General Pershing and those under his command and all that is said in regard thereto as affecting the question of date of Government control. When he took control of the vessel he simply took a vessel that was already under Government control and took it as a representative of the Government. His act neither increased nor diminished the rights of the Government or the rights of the plaintiff at that time, because they had been previously fixed. Nor is it of any consequence whether he took it with or without authority of the Shipping Board. It is apparent that his action was acquiesced in by that board.
It has been urged that the alleged contracts or commitments which the plaintiff had previously arranged and in pursuance of which the vessel was loaded for the voyage to-Havre were taken by the Government, and-that the plaintiff should be compensated therefor by being paid the net proceeds of the voyage. This contention has no merit. The plaintiff was acting as agent of the Government in taking this material aboard and under instructions from the Government and for Government account. No question was *814 raised as to the taking and value of these contracts at the time plaintiff was given permission to load the boat and make the voyage on Government account. It does not appear that plaintiff would have been liable for damages had it failed to carry out these commitments, and the profits of the voyage depended entirely upon the safe arrival of ihe ship at its destination. There is no proof in the record of the market value of these alleged contracts at the time and place of the alleged taking or, for that matter, any details as to the contracts themselves. They were not directly and .specifically taken, nor does there appear any intention upon the part of 'the Government so to do. There was no taking by the Government. Omnia Commercial Co. v. United States, 261 U. S. 502. The vessel was received by the United ■States under a contract to be operated on Government ac•count on this voyage and any others as long as it was under Government control. The plaintiff requested permission to fulfill, on Government account, some of its own previous ■commitments, and permission was granted it to do so, the Government assuming all the risks of the voyage, the plain-biff to be paid for the use of its vessel at the “ time-form ’’ rate of $6.25, which covered the expenses of operation of the vessel during the voyage, which were to be paid by the plaintiff. As stated, the voyage ivas on Government account. If there was a loss, the Government was liable; and if there was a gain, the amount belonged to the Government. The plaintiff was merely the agent of the Government in handling the ship and conducting the voyage and transferring this cargo. The voyage could not have been taken or the cargo placed aboard without the consent of the Government. Had the latter refused to grant permission there would have arisen no liability upon the part of the Government as to these alleged contracts; nor, under the circumstances, could the plaintiff have been held for a breach.
But, aside from this, there is no proof, as stated, of the value of these contracts, nor any attempt to prove their market value at the time and place of the alleged taking. .Reliance is placed solely on the proof of the net proceeds of the voyage as showing value. It is enough to say that such is not a proper measure of value under the circumstances.
*815 There i.s still another question which has been raised in this case. The Government filed a counterclaim (Finding NLIII) in the nature of an indebtedness of the France & Canada Steamship Corporation to the United States in the sum of $734,958.75, upon the theory that the ownership of the plaintiff corporation and the France & Canada Steamship Co. were the same; that there was such identity of interests and control as made them, in the eyes of the law, one •corporation. Without going into detailed discussion of thi.s phase of the case, it is enough' to say that the facts as shown do not establish such identity of interests. But, apart from this, it has been found that the amount of the indebtedness doe.s not definitely appear.
In balancing the account between plaintiff and defendant covering the items of debit and credit heretofore mentioned, the plaintiff is shown to be indebted to defendant in the sum •of $337.66, and for this sum judgment should be entered in favor of the defendant.