*573 conclusion OF law.
Upon the foregoing findings of fact the court decides, as a conclusion of law, that the plaintiff’s claim amounts to $3,974,379.76, and that the defendant has a counterclaim, set forth in Findings XVIII and XIX, amounting to $4,428,-828.29, and that the defendant is entitled to recover upon its counterclaim the sum of $454,448.53, with interest thereon at sis per cent per annum from June 12,1922.
It is therefore adjudged and ordered by the court that the United States have and recover of and from the Gulf Refining Company the said sum of four hundred and fifty-four thousand four hundred and forty-eight dollars and fifty-three cents ($454,448.53) with interest thereon at the rate of six per centum per annum from June 12,1922.
MEMORANDUM BY THE COURT.
The plaintiff has asked leave to file what it terms exceptions to errors of omission and commission in the findings of fact, conclusions of law, and judgment of the court, filed June 25, 1923. Since the motion to further amend the findings has been considered and allowed in part, at least, which makes necessary new findings, the court, as is usual in such cases, files new findings and withdraws those filed June 25, 1923. This fact renders unnecessary any ruling upon the motion to file exceptions.
The court has again given consideration, to plaintiff’s requested findings, and in response to them files new findings. Our rules forbid the filing of a second motion for a new trial, except by permission of the court. This rule is designed to bring the litigation to an end by requiring parties to file their requests for findings “ before trial,” as contemplated by the rules of the Supreme Court applicable to this court. Our rule recognizes, however, that a second motion may be allowed, if the court thinks it should be, and hence the findings requested have been again considered. Sometimes they ask new or additional facts, but generally they are repetitions of prior requests.
These additional findings are not, in all instances, what plaintiff asks to be found, and may be different from what *574 plaintiff insists are the facts. The rule requires “ a finding by the Court of Claims of the facts in the case, established by the evidence, in the nature of a special verdict, but not the evidence establishing them.”
Without repeating them here, the court refers to its opinion at the first hearing, and the memorandum made and attached to its findings of June, 1923, for the reasons for its action and judgment.
The plaintiff urges its right to interest. The facts show that át different times the plaintiff collected monies from the operations of some of its vessels, for which it was accountable to the United States. These sums it retained, and if one party was entitled to interest the other was also entitled to it. The amount that should bear interest was the difference between what the Government owed plaintiff and what the latter owed the Government. That amount has been fixed by the judgment, which the court is of opinion should bear interest from the original date of the rendition of judgment, and the court’s conclusion has accordingly been amended in that regard.
The following opinion of the court was filed June 12,1922, upon the first hearing of the case. The findings and judgment therewith filed have been withdrawn by order of the court, and the findings and judgment as hereinbefore set forth substituted therefor.
Campbell, Chief Justice,
delivered the opinion of the-court:
During the war with Germany the United States requisitioned certain vessels, called tankers, belonging to the plaintiff. They were requisitioned under the provisions of the act of June 15, 1917, 40 Stat. 182. By an Executive order dated July 11, 1917, the President delegated to the United States Shipping Board the power and authority vested in him by said act, and on October 12, 1917, the Shipping Board issued its requisition order covering all American cargo and tank ships of 2.500 tons total dead weight or more, this order to be effective on October 15, 1917. On October 16, 1917, physical possession of one of the plaintiff’s vessels *575 was taken by the Government, and at different times thereafter five other vessels were taken physical possession of. The plaintiff owned a fleet of 12 vessels that could have come within the requisition order, and at the time this order was issued plaintiff was engaged in large and profitable enterprises in the purchase and distribution of petroleum and its products. It sues for the value of the use of its vessels during such times as they were in the possession of the Government, and also claims several millions of dollars on account of the loss to its business occasioned by the requisitioning of its vessels and the taking possession of them.
The statute which authorizes the requisitioning and taking over of vessels prescribes that whenever this is done just compensation therefor shall be made, to be determined by the President, and if the amount thereof so determined be unsatisfactory to the person entitled to receive it such person shall be paid 75 per cent of the amount, and may sue for such additional sum as will make just compensation.
The plaintiff’s petition claims “ a just, fair, and reasonable value of the hire” of its several ships during the periods in which they were held by the Government in physical possession. The question therefore is, What is the just compensation that should be awarded in this case in accordance with the statute authorizing the requisitioning and taking possession of plaintiff’s vessels? In arriving at a conclusion the court must ascertain the value of the use of these vessels, and this does not mean the value of their use to the Government which takes, but the value of the use to the person from whom they are taken, when that question becomes a material one. Monongahela Navigation Co. Case, 148 U. S. 312, 343. The statute authorizing the taking provides for just compensation, thereby recognizing the fact that whether the act authorizing the taking was an exercise of what is sometimes called the war power of the Government, or was the exercise of the inherent power of eminent domain, it is yet subject to the general provision of the fifth amendment. We may therefore assume that a party entitled to just compensation for its property that has been taken is entitled to its full equivalent. It is to be admitted that the exigencies of war may render it more or less difficult to ascertain what *576 the just compensation should be, but the existence of a state of war can not be justly said to suspend the provisions of the fifth amendment. Cohen Grocery Co. Case, 255 U. S. 81; Hamilton v. Kentucky Distilleries Co., 251 U. S. 146,156. The same rules are applicable in the ascertainment of values of property taken during a war as are applicable for property taken during times of peace. As has been suggested, it may be more difficult to find what the market value is, for instance, in times of war than it would be to find what the market value of a commodity is in time of peace, but if there be a market the fact is as controlling in the one time as it is in the other. A war may, and does, enhance prices, and one of its horrors is that it may by injuring or destroying supplies, produce distress and want, but that does not justify the taking of property of an individual at less value than the individual himself would have to pay to supply its place. The individual having property which is taken for public use is not required to make a greater contribution than other citizens similarly situated to the public good, and all other citizens are expected to bear their part of the general expense. It is not necessary to abandon well-established principles of law in order to hold the balance even between the citizen and the Government when his property is thus taken. Just compensation is all that can be asked for, and just compensation should be given for property taken in time of war as well as that taken in time of peace. The value of the property must be arrived at, if possible, and its market value is its true measure of value if that can be determined in the particular case. But where a board created by law and authorized to take over the property fixes a certain valuation it must be recognized that the fixing of the valuation is not conclusive upon the courts. Monongahela Orne, supra. In the case at bar it appears that the rates fixed by the Shipping Board were more or less of an arbitrary nature. As stated by the head of the board, referring to its calculations, “ we were a little arbitrary, but we didn’t make these arbitrary calculations in an arbitrary spirit.” In other words, we may say, they exercised their best judgment; but, as stated by this same witness, the Shipping Board endeavored to exercise a re *577 straining control over rates. The rates fixed by the board were determined upon consideration of the facts that the American mercantile marine had a number of old steamers, that there was a difference in their size and a difference in their type, and it concluded that it would make a general rate applicable to all based on the value of $175 per ton. This method of ascertaining the value of a particular ship is plainly inaccurate. Taking the average of a number of ships, some large and some small, some new and some old, belonging to different owners, does not determine the value of them, unless all are of the same value, which was not the case. The board considered it impracticable to ascertain the value of each separate vessel, and, viewed from their standpoint, this is probably true. But the fact does not alter the legal situation, and the owner of vessels dissatisfied with the rate proposed by the board has the right to have the value of his vessel or its use ascertained.
In the case at bar the evidence shows that the ships taken by the Government were valuable, that their use was valuable, that there was a demand for such ships and the use of them, and the supply of such ships, and indeed of all kinds of ships was limited. Also that the ships- were suitable for the uses to which they were put, and could have been used by the plaintiff for like purposes. There was a market for such ships and the use of them, and the value of the use of plaintiff’s ships has been ascertained to be $6.60 per deadweight ton bare-boat basis for the period during which they were in the physical possession of the Government. That, in our view, is the just compensation to which plaintiff is entitled.
In ascertaining the value of the use of plaintiff’s vessels some consideration is due the fact that the plaintiff was using, and could use, its vessels in a profitable business. A large part of the claim in this case is based upon the alleged damage to its business caused by the taking of the vessels from the plaintiff under the requisition order. We are of opinion that this item of damage to the business is not allowable because, in the first place, of the uncertainty of ascertaining such damage, and because while it may be that its *578 business was seriously injured and heavy losses entailed upon the plaintiff, these losses and damage were consequential or incidental to the exercise of a lawful power to-take this property, and though the loss may be no less real than the taking of the property itself we think that what the plaintiff can be compensated for is the value of the use of its property actually taken and used by the Government.
The defendant interposed a counterclaim based upon the-fact that while the boats were in its possession and operated by the plaintiff under its direction they made large earnings.. From these earnings are to be deducted the operating expenses, and after crediting the balance thus ascertained with the amount produced by an application of the board rates a sum would still remain in the hands of the plaintiff in excess-of two millions of dollars. It thus appears that the earnings of four of the plaintiff’s vessels while in the possession of the Government aggregated over three millions of dollars. Deducting from the net balance in the plaintiff’s hands out. of the earnings the amount found due upon the rate ascertained by the court there is still due from the plaintiff to the defendant the sum of $172,213.56. Judgment will therefore-be rendered in favor of the defendant for this sum upon its-counterclaim, and it is so ordered.
Hay, Judge, and Downey, Judge, concur.
Graham, Judge, concurs in the result.
The following memorandum by the court was announced on June 25,1923, upon the hearing on both parties’ motions, for new trial and amendment of the findings. The findings and judgment therewith filed have been withdrawn by order-of the court, and the findings and judgment as hereinbefore set forth substituted therefor.
MEMORANDUM BY THE COURT.
From time to time since the former judgment in this case applications by consent of both parties for extension of time-within which to move for new trial or amendments of findings have been granted and, nearly a year intervening, both parties have filed such motions. Argument upon these motions has been heard. The amount of the judgment has been *579 changed because of an. item of expense in operation which did not satisfactorily appear in the record as first submitted.
The court adheres to its view that the just compensation to which the plaintiff is entitled is properly fixed as of the date the requisition order became effective. The legal effect of the order itself under the facts of this case was to place the vessels under Government control. The requisition order referred to in Finding IV notified owners of vessels that those being operated in their regular trades were to continue the operation “ for account of the Government, as they have been doing for themselves,” while owners whose vessels were chartered were to apply to the Shipping Board for instructions regarding their future employment. The order stated the rate which the board would allow.
This conclusion finds support in the subsequent agreements between the parties. In the first of these, Exhibit A to the petition, the plaintiff agreed to sign certain requisition charters covering all its tank steamships “ included within the description ” of the requisition order, the requisition charters to be effective as of the date they would have been effective under the terms of the requisition order if they had been signed and delivered on October 12, 1917. They agree to account to and with each other as though said charters had become effective as aforesaid. There was a definite reservation by plaintiff as to the compensation to be paid, “ it being understood, however, that the validity, effect, and application of the requisition order of October 12, 1917, in accordance with the terms thereof as to any vessel covered thereby, shall Be recognized by the owners for all purposes of this agreement.” In the “ second ” clause of this agreement is a provision defining the status of the vessels when being operated for the owner, and providing that the use in such case by the owner shall be in full satisfaction of the obligations of the United States and the: owner under said requisition applicable to such period. This provision settles any question of compensation while' the owner was permitted to operate its vessels on its own. account, and it is significant that by the “ sixth ” clause the-owner agreed that during these same periods “ the requisi *580 tion rates from time to time established ” by the Shipping Board shall be observed. The board established rates, the owner applied them — or, at least, did not exceed them — and for such times the Government was under no obligation to make any other compensation. The agreement further provides, however, that while the vessels are being operated in the trans-Atlantic service or service other than that of the owner they “ shall be operated under the terms and conditions of the bare-boat form of requisition charter ” mentioned therein. Stipulating that if the owner does not accept the hire established by the board for this trans-Atlantic or some service other than that of the owner, the latter may accept three-fourths of the proposed compensation and sue for such additional sum as will make the just compensation to which the statute as well as the Constitution recognizes the owner is entitled, the agreement proceeds: “ Said ‘ bare-boat form ’ of requisition charter shall be deemed effective since noon of October 15, 1917, as to said tank steamships while employed in trans-Atlantic service or in some service other than that of the owner.”
This requisition agreement is referred to in the petition and in the requisition charter (Exhibit B to the petition), which recognizes the order of October 12 and declares that the particular vessel shall be operated according to the terms and conditions of the requisition agreement and of the “ bare-boat form,” made a part thereof, “ all of which instruments are to be construed together at whatever date they may be signed.” On the face of each of the “ requisition charters ” is the statement, “ Date vessel came under requisition, Oct. 15, 1917.” These agreements of June and July, 1918, were made long after the vessels had passed into “the trans-Atlantic service or service other than that of the owner.” They in terms relieve the Government of any obligation for hire growing out of the requisition order while the vessels were not being operated in trans-Atlantic service or other service than that of the owner. The Shipping Board rates were accepted for the vessels used in the owner’s service. The owner operated the vessels as agent for the United States while they were in trans-Atlantic service or some service other than that of the owner. The volun *581 tary signing of these agreements did not deprive the owner of the right reserved to just compensation for the service mentioned. On the other hand, the signing of them was not obligatory. They effectually remove any question of compensation while the owner was permitted to operate on its own account, notwithstanding for that service the Shipping Board rates were to govern. They only leave open the just compensation to be awarded for the vessels used in transAtlantic service or some service other than that of the owner.
As already stated, we think that the taking, for which just compensation is required by law, was effectuated, under the facts of this case, when the requisition order of October 12 became effective, and that compensation should date from the time of the taking. It is quite true that the plaintiff has not waived right to just compensation, hut we also think, as above stated, that the effect of the agreements is to recognize the taking in this case as effectual at noon October 15.
There is no merit in the contention of plaintiff that the earnings of the vessels while engaged in trans-Atlantic service other than that of the owner constitute a trust fund to which plaintiff is entitled. When the Government takes property of the citizen under the inherent power of eminent domain it is not a wrongdoer. All property is held subordinate to this power. The salutary provision of the fifth amendment and the terms of the statutes, under which in this case the taking was had, require that just compensation be made, but the Government is in no sense a trustee, and is not required to account for the earnings. Its liability remains if there be no earnings. The suggestion that the Government made profits by the use of these vessels by charging a greater rate than the board’s rate, or the just compensation established by the court’s findings, seems to leave out of view any consideration of the fact that the charge was upon a voyage rate basis and that the overhead expense to the Government in its operation of the vessels and the great expense of the necessary convoy are not put into the account. In other words, it does not even appear there were any profits. Nor is a charter rate conclusive. The *582 vessels were taken, not for a voyage, bnt for suck use and time as the Government saw fit. The rate allowed is a monthly rate for the vessels, and the bare-boat form so provides.
Judgment is rendered for defendant on its counterclaim, as stated in the court’s conclusion.