Hay, Judge,
delivered the opinion of the court:
On October 12, 1917, the plaintiff company owned four tankers, th„ Astral, Royal Arrow, and Standard Arrow, which had been and three of which were then engaged in the transportation of the products of the Standard Oil Company across the Pacific Ocean. The plaintiff also had building under contracts with the New York Shipbuilding Corporation two tankers then known as hulls *948 Nos. 17and 175 and afterwards known as the Sylva/n Arrow and the Broad Arrow.
On August 7, 1917, the President, acting through the Secretary of the Navy and under authority of the act of June 15, 1917, requisitioned and took physical possession of the Standard Arrow and took it out of the Pacific trade and retained it in the Government service for eighteen months. For the use of this vessel and for other vessels of the plaintiff’s which were taken over by the United States, the plaintiff agreed to accept, and did accept without protest, the rate fixed by the Shipping Board, which rate was $4.15 per dead-weight ton per month on a bareboat basis. Upon this basis the plaintiff was paid, and the Standard Art'ow is thereby eliminated from consideration in this case. It may be observed that it was within the power of the United States to have taken the other three vessels from the Pacific trade and to have transferred them to the Atlantic trade, and that the plaintiff would in that event only have received the rate which it did receive and accept for its other vessels.
On October 12, 1917, the Shipping Board acting by virtue of an Executive order dated July 11, 1917, under the provisions of the act of June 15, 1917, covering all American cargo and tank ships of 2,500 tons total dead weight or more, which order was effective October 15, 1917, requisitioned the three vessels involved in this suit, they being of the class covered by said order.
The plaintiff executed the requisition agreement dated August 22, 1918, attached to the petition as “ Exhibit B-l.” Under the terms of this agreement the plaintiff agreed that these ships “while operated in trans-Atlantic service, or.in some service other than that of the owner ” should be operated under the terms and conditions of the “ bare-boat form ” of requisition charter (U. S. S. B. Charter Form No. 3). That form provided for payment of monthly hire established by the United States Shipping Board as just compensation, but if the owner did not accept that rate it should be paid 75 per centum of the rate so established and be entitled to sue for such further sum as added to said 75 per cent would constitute the just compensation re *949 quired by law. The plaintiff refused the Shipping Board rate of $4.15 per dead-weieht ton per month on a bareboat basis.
The agreement further provided:
“ When operated in trans-Atlantic service, or in some service other than that of the owner, the owner, when requested, agrees to act as operating agent of the United States Shipping Board for such compensation as may be determined by said board according to a general plan to be hereafter established.
“ For the purposes of this agreement, a tank steamship shall be deemed in the service of the owner only—
“ (a) When employed in the usual previous service customarily maintained by the owner, carrying cargoes exclusively owned by the owner or by a company affiliated with it under common control, or
“ (&) When employed in the carriage of cargoes owned by any other owner of tank steamships or a company affiliated with it under common control in the usual previous service customarily maintained by any such owner, provided, however, that in such case the freight charged and the differentials allowed shall not be fixed at amounts which will yield a greater return to the owner on any voyage than that produced by the requisition rates from time to time established by the United States Shipping Board.
“All freights collected for the carriage of cargoes other than as above stated shall be accounted for under the ‘ bare-boat form ’ of requisition charter (U. S. S. B. Charter Form No. 3), as provided for in clauses ‘First’ and ‘Third’ of this agreement; the owner, however, of any tank steamship not covered by requisition charter (U. S. S. B. Charter Form No. 2) reserving the rights specified in clause ‘ Third ’ hereof to accept seventy-five per centum of the hire established by the United States Shipping Board as the just compensation required by law, and to bring suit against the United States for such just compensation.”
It was also provided in the contract as follows:
“ The United States shall assume war, marine, and all other risks of whatsoever nature or kind, including all risk or liability for damage occasioned to other vessels, persons, or property.”
It will be observed that this contract was most advantageous to the plaintiff. Under it the plaintiff was enabled to transport its own products across the Pacific without the *950 payment of freights and at the same time was insured against loss. No other owner had so advantageous a contract so far as we have been able to learn; what products of its own it carried does not appear, but judging by the amount of freights earned in the return voyages of its vessels they must have been very large.
In return of these advantages the plaintiff agreed to act as operating agent of the United States Shipping Board on the return voyages of its vessels “ for such compensation as may be determined by said Board ” with the privilege to the' owner of refusing the compensation so fixed and suing for just compensation.
The plaintiff is now suing for just compensation for the use of the said three vessels, and is, of course, bound by the terms of its contract with the Government. It is not difficult to determine upon what principle the compensation should be based. We have had this question before us in the case of Gulf Refining Company v. United States, 58 C. Cls. 559. We determined that the rate of hire fixed by the United States Shipping Board is not binding on the court when the owner is dissatisfied with such rate and brings suit in this court for the use of its vessels; and that the value of the use of the vessels to the plaintiff must be determined by the evidence submitted of such market value at the time the vessels were taken. We can see no difference between the case cited and the case at bar, and applying the principles above cited to the evidence in this case, we have determined that a reasonable rate of hire for the use of these vessels during the period of the return voyages is $6.60 per dead-weight ton per month. Upon that basis we have felt constrained to enter a judgment for the defendant, after giving the plaintiff credit for the hire of its ships, the operation expenses thereof, and the items set out in Findings XV and XVI.
The plaintiff contends that the earnings of the vessels on the return voyages should be taken as a basis for the determination of the value of the úse of the vessels. This same contention was made in the Gulf Refining Company case and was then disposed of. (See p. 581.) We see no reason to change the conclusion then arrived at. There is no evidence *951 in this case which makes it any different from the Gulf Refining Company case, and we feel impelled to adhere to the principles laid down in that case.
Judgment will be entered for the defendant in the sum of $1,222,540.43. It is so ordered.
Graham, Judge; Booth, Judge; and Campbell, Chief Justice, concur.