Booth, Chief Justice,
delivered the opinion:
This case, like the following cases, viz, Gulf Refining Co. v. United States, 58 C. Cls. 559; Standard Transportation Co. v. United States, 61 C. Cls. 906; and Standard Oil Co. v. United States, 61 C. Cls. 951, is for the recovery of just compensation for the use by the Government of certain tank vessels during the war. The vessels known as the Folger and Van Dyke were each requisitioned under precisely the same laws and in precisely the same manner as the vessels in the cases cited above. The court in the Gulf Refining case exhaustively considered the primary principles involved in the statute authorizing the requisition of vessels and the right of the owners to just compensation. These questions now again raised herein, and upon which the decision of the court in the Standard Transportation case (certiorari denied, 273 U. S. 732) was predicated, exact in this instance no additional discussion, and to them, as previously decided, we will adhere in the determination of the instant case. That the plaintiff is entitled to just compensation for the use of its vessels is not denied. The real issue here is as to the amount to be allowed, and the liability of the plaintiff upon defendant’s counterclaim, plaintiff con *22 tending that as to certain voyages of the Folger the requisition orders are not applicable. The facts upon which the argument as to the Folger rests are as follows:
About September 1, 1917, the chairman of the Anglo-American Oil Co. (Ltd.), a member of the British Petroleum Pool, requested of the plaintiff the use of the Folger in the transportation of four cargoes of gasoline to the United Kingdom at the rate of 110 shillings per ton, with war-risk insurance upon a valuation of $3,000,000 to be paid by the consignee. A charter party dated September 12, 1917, was duly executed by the parties covering the above terms and conditions, and the first voyage of the Folger was begun on October 20, 1917, and was completed December 17, 1917,. the dates being important. (Finding VI.) The second voyage of the Folger began December 18, 1917, and was completed January 30, 1918. As to each of these voyages the plaintiff collected the charter rate of freight, i. e., 110 shillings, although no written charter covered the second voyage. The plaintiff now insists that as to these two voyages it is entitled to retain the full freight rate of 110 shillings per ton collected by it, and seeks to sustain the insistence, upon the theory of noninterference by the Government with the execution of its contracts, of a course of governmental conduct, which amounts to no more than a mere paper requisition, i. e., the Government had not at this time done more than issue its notices of requisition, without taking physical possession of the vessel. The case of the Marion & Rye Valley Railway Co. v. United States, 270 U. S. 280, is cited to sustain its position.
It is to be noted, as appears from Finding IV, that the requisition order of October 12, 1917, requisitioned “ all cargo ships and tankers able to carry not less than twenty-five hundred tons total deadweight, including bunkers, water, and stores.” This order was to become effective October 15, 1917, at noon. Beyond disputation, the Folger falls within the terms of the order. This fact is not denied, and if the processes of requisitioning the vessels enumerated in the order had ceased immediately after its issuance and nothing more had been done, cogent and convincing reasons would obtain to bring the two voyages within the principles *23 announced by the Supreme Court in the Marion & Rye Valley case (supra). Such is not the fact, however. In the Marion & Rye Valley case the Government at no stage of the proceedings exercised ownership over or took possession of the railroad properties. The railroad company — a short-line road — was allowed to conduct its affairs and operate its line free from governmental control or interference, conduct which clearly indicated an intent to exclude from the order of requisition the railroad involved. Quite the opposite obtains as to the processes employed to obtain the title to or use of the vessels involved in the requisition order of October 12, 1917. The notice itself expressly stated to the owners of vessels coming within its terms that “ steamers chartered to others will apply to the Shipping Board for instructions regarding the future employment of said steamers.”
It is true the plaintiff accomplished the two voyages and collected the freight stated in the charter for the first voyage, paid in this instance as in all others the expense of the voyages, but it is also true that the two voyages were accomplished subsequent to the date of the requisition order, with which the plaintiff was positively familiar, and which was followed in direct sequence by the agreement of June 12,1918 (Finding XII), which the plaintiff signed and does not now disavow. The agreement of June 12,1918, expressly recited that as to the effective date of requisition the parties thereto agreed upon October 12, 1917, and “ the parties agree to account to and with each other as though said charters had become effective as aforesaid.” What was the situation with respect to the exercise of the war-time right of requisition? The Government in pursuance of statutory authority was taking over all the vessels of a designated capacity, not only all the designated vessels in, and capable of operation, but contracts for uncompleted vessels in course of construction.
A programme so comprehensive could not eo instanti operate to do more than bring to vessel owners notice of the requisition, leaving to the future the details of the enterprise. As soon thereafter as it was humanly possible vessel owners were apprised of the Government’s terms and con *24 ditions of requisition, and opportunity afforded each owner to assent thereto or stand upon his rights under the law. Manifestly, compensation was to be paid, rates adjusted, and the innumerable details attendant upon existing charters, vessels upon the high seas, etc., were to be made the subject of attention and agreement.
The agreement of June 12, 1918, was the result of the expressed willingness of the Government to afford vessel owners an opportunity to come to terms under the previous requisition order. The Government was not alone concerned with its own imperative necessities. A survey must be made, a plan mapped out so that in carrying into execution the wholesale requisitioning of vessels the customary business of the owners might suffer a minimum of loss. The process of requisition, the orders, agreements, and charters executed clearly indicate the intended purpose of the Government to take over and retain within its control and ownership the title to or use of all the ships described therein, so that if the existing emergency became more acute, the means were at hand to meet it. No vessel was to be exempt and no vessel was exempted from the order, if it came within it. What possible purpose can be assigned for exempting the Folger% By the express terms of the order the owners, this plaintiff, agreed, to sign United States Shipping Board charter form No. 3, covering all tank steamships owned by it and included in the requisition order of October 12, 1917, as and of the date October 12, 1917. The plaintiff further agreed to operate the vessels under the charter form No. 3 in the trans-Atlantic service, and further agreed to account to the defendant for all freights collected “ for the carriage of cargoes ” other than cargoes carried in the usual and customary service of and for the owner.
In view of this situation it is difficult to view with seriousness a contention that has for its foundation a segregation of the requisition order in such a manner as to render it ineffective as to two voyages and effective as to subsequent ones on the theory that certain voyages were accomplished without alleged governmental interference, whereas others *25 were positively interfered with, when the transaction as a whole is one of continuity. In our opinion the general requisition order accomplished its intended purpose, and followed as it was in this instance with specific acts of dominion and ownership, operated to take over the Folger upon the date of its issuance. The Government could not in a single day dispatch officials to seize the vessels. The subject matter of the requisition order admitted of no other process than the one employed. We so held in the cases first cited and have not departed from these decisions. The plaintiff knew when the Folger sailed upon the two voyages under discussion that the vessel had been requisitioned by the Government. It was carrying war supplies to an ally, and little reason existed for governmental interference. In the Gulf Refining case (supra) we held that the legal effect of the requisition order was to place the ships from the date thereof under Government control.
The Folger made six additional voyages — it is unnecessary to discuss them in detail. They were made as operating agents for the defendant and the vessels were under requisition as to use and governed as to compensation by the agreement of June 12, 1918. A suggestion is found in the plaintiff’s final petition that the execution of the bare-boat form of charter No. 3, which was never signed by the plaintiff, amounts to a waiver of the requirement appearing in the agreement of June 12, 1918. We think it exacts no more than a mere statement to demonstrate that where parties expressly agree to create a relationship and thereafter act in accord with the created relationship, one asserting rights thereunder and the other silently acquiescing therein, the issue of waiver is eliminated from the transaction. The bare-boat form of charter No. 3 did obligate the defendant to bear the total expense of operation. The defendant does not disavow that liability now. The plaintiff collected the freight charges for the voyages of the Folger and has now and has had the full amount of the same in its possession ever since, and will be given credit therefor in accord with charter No. 3. '
*26 The court said in the Gulf Refining case, 58 C. Cls. 559, 575, “It is to be admitted that the exigencies of war may-render it more or less difficult to ascertain what the just compensation should be, but the existence of a state of war can not be justly said to suspend the provisions of the fifth amendment. Cohen Grocery Co. case, 255 U. S. 81; Hamilton v. Kentucky Distilleries Co., 251 U. S. 146, 156. The same rules are applicable in the ascertainment of values-of property taken during a war as are applicable for property taken during times of peace.” Applying to the record supplied by the parties the rule for ascertaining market value, the court finds a wide divergence as to facts. Vessels not under requisition, owned and operated under the flag of a neutral nation, would beyond doubt command a freight rate much in advance of others handicapped by requisition and operated under the flag of a nation party to the war. Kia Ora, 252 Fed. 507; Harries v. Shipping Comptroller, 34 T. L. R. 446. Our jurisdiction imposes the duty of reconciling the facts. This we have done, and taking the record as a whole upon the subject, we are convinced and have found that a bare-boat rate of $6.60 per deadweight ton for the entire time the vessels were in the possession of the Government is the just compensation to which the plaintiff is entitled. In reaching this conclusion as to the existence of a market and the market value, we have not done so upon the basis of prior cases, but based our conclusion exclusively upon the record herein.
We said in the Gulf Refining case (supra), page 581, “There is no merit in the contention of plaintiff that the earnings of the vessels while engaged in trans-Atlantic service other than that of the owner constitute a trust fund to which plaintiff is entitled. When the Government takes property of the citizen under the inherent power of eminent domain it is not a wrongdoer. All property is held subordinate to this power. * * * The suggestion that the Government made profits by the use of these vessels by charging a greater rate than the board’s rate, or the just compensation established by the court’s findings, seems to leave out of view any consideration of the fact that the charge was upon a voyage rate basis and that the overhead *27 ■expense to the Government in its operation of the vessels ■and the great expense of the necessary convoy are not put into the account. In other words it does not even appear there were any profits.” To which quotation we may add that the value to the taker of the property taken is immaterial. Monongahela Navigation Co. case, 148 U. S. 312.
defendant’s COUNTERCLAIM
Finding III depicts the situation of the plaintiff’s vessels Herbert L. Pratt, W. M. Irish, and W. M. Burton on August 3, 1017. These vessels were in course of construction and were taken over by the Government while in this condition at the Bethlehem Shipbuilding Corporation, San Francisco, Calif. On the respective dates mentioned in the finding the vessels were reconveyed to the plaintiff and their 'use requisitioned. The consideration for their reconveyance was in part the execution by the plaintiff of requisition charter form No. 2, which the plaintiff did sign. By the terms of the charter plaintiff agreed to operate the vessels as agent for the Government, and that freight charges, whether for proprietary or commercial cargo, would be as the defendant directed, the defendant agreeing at the same time to accept the bare-boat rate of $4.15 per deadweight ton for the use of the vessels by the Government, or the other fixed.rate of $5.75 per deadweight ton on a time-form charter basis. We have with some degree of reluctance set out in Finding XLV two letters mailed to the plaintiff by the defendant. This has been done at the urgent request of the defendant and for the additional reason that defendant predicates its counterclaim in part upon the same. On June 12, 1918 (Finding XII), an agreement was consummated between the plaintiff and defendant which provided, among other things, as follows:
“ Except during such periods as said tank steamships may be or may have been operated in trans-Atlantic service or in some service other than that of the owner, said tank ■steamships shall be operated in the possession and service of the owner and for the sole risk and account of the owner free from any obligation to account hereunder to the United -States Shipping Board, and the use of said tapk steamships *28 in such case by the owner shall be in full satisfaction of the obligations of the United States and the owner under said requisition applicable to such period, and/or under any operating agreement as contemplated by clause ‘ Fourth ’ hereof.
“ For the purpose of this agreement a tank steamship shall be deemed in the service of the owner only:
“(a) When employed in the usual previous service customarily maintained by the owner, carrying cargoes exclusively owned by the owner or by a company affiliated with it under common control, or
“(b) When employed in the usual previous service customarily maintained by any other owner of tank steamships,, irrespective of the ownership of the cargoes which may be' carried, provided, however, that in such case the freight charges and differentials allowed shall not be fixed at amounts which will yield a greater return to the owner on any voyage than that produced by the requisition rates from time to time established by the United States Shipping-Board.”
The Herbert L. Pratt was completed and delivered to the-plaintiff on March 1, 1918, the W. M. Irish on May 2, 1918,. and the W. M. Burton on June 25, 1918. Each of these vessels on their maiden voyage from California to the Atlantic coast transported cargo of the plaintiff’s own oil to the plaintiff’s refinery at Philadelphia. Of course, the plaintiff collected no freight for said voyages.
The defendant predicates a right to recover from the plaintiff for the cargo transported’ on these voyages at the rate of 6 cents per barrel, according the plaintiff’s credit for carriage freight at the amount fixed by the Shipping Board on several grounds. The 6-cent rate was fixed by the Shipping Board on October 24, 1918. First, the defendant asserts an agreement or understanding entered into by the parties that the maiden voyage of the vessels from the Pacific to the Atlantic coast, where they were to be operated, exists, whereby the vessels would be operated on the account of the United States. This agreement is spelled out of, in part at least, the correspondence appearing in Finding XLV, and is relied upon as a contemporaneous construction of the contracts of reconveyance and the agreement of June 12, 1918, by the parties, in accord with which the voyages *29 were accomplished. The first obstacle the contention encounters is that, as a matter of fact, the letter of April 29, 1918, did not reach the plaintiff until after the agreement of June 12, 1918, had been signed by the plaintiff. The next difficulty in the way is the fact that no such reservation was placed in the agreement of June 12, 1918, and no mention made of it when it was signed, notwithstanding a specific stipulation in the same defining when a tank steamship will be deemed to be in the service of the owner, appears thereon, and ample time existed for the defendant to expressly provide therein for the voyages involved.
There is no proof in the record that plaintiff acquiesced in the construction put upon the contract by the defendant. The mere fact of silence, i. e., failure to answer the letter, in view of what was happening and what did happen, is not sufficient to warrant an inference of consent. As previously observed, the defendant was solicitous as to plaintiff’s customary business. Gasoline and oil products were an essential war material, and to unnecessarily cripple plaintiff’s resources to produce the same was not intended except as a last resort, so the defendant readily agreed to reconvey title to the plaintiff, requisition the use, and so far as possible remit to the owner the unfettered right to employ the vessels on its own account and in its own business free from governmental interference. To this end the parties, as a final step in the acquisition of the vessels, expressly defined when a vessel should be deemed in the customary service of the owner. Here we have two written instruments executed by the parties, replete in detail, upon each of which various contentions are rested in this case, and now we are asked to hold that the plaintiff is estopped to deny that freight rates were to be charged against it for the transportation of the cargoes involved, upon the theory that two letters written by one party and not specifically answered by the other constitute an agreement to pay as freight a sum in excess of $340,000.
As a matter of fact the plaintiff did protest against any such construction of the contracts and repeatedly asserted to the contrary. It is true that after the voyages were accomplished the Shipping Board continued to assert its right to *30 collect freight, but assuredly this amounted to no more than a claim of right. The situation as a whole, sustained-by the facts, clearly discloses that the parties were dealing with each other upon an express contractual basis, subsequent to the requisition, as found in the executed contracts, and the issue as we view it is narrowed to the point of a decision as to whether the voyages come within the defined scope of what constitutes “ the usual previous service customarily maintained by the owner ”; that the vessels were carrying their own oil, exclusively owned by the owner, is of course conceded. The defendant allowed the vessels to carry a cargo of its own oil to its own refinery. The defendant confines the term “ previous service customarily maintained by the owner ” to an established and repeatedly used route; i. e., it is said the plaintiff did not previously maintain vessels in the transportation of oil from California to the Atlantic coast.
If the definition is so restricted the defendant is right. Going to the record, however, we find that tank steamships owned by oil refineries are uniformly and universally employed in gathering cargoes of crude oil where it may be purchased the cheapest and transported at the least expense. The discovery of a new oil development may change the course of their sailings, and the primary purpose of maintaining a tanker fleet is to transport oil from the point of its acquisition to the refinery. Of course, the supply in Mexico established a route from Mexico and Gulf ports to the Atlantic, but the output in California, then meager, now abundant, may suddenly reverse existing conditions. Giving to the words used their ordinary significance, they seem to convey an intent to relieve the owner from freight charges for transporting the owner’s own cargoes, if the transaction is in accord with the usual and ■ continued service adopted and pursued in conducting the owner’s business. The language is “previous service customarily maintained,” and service, it seems to us, has a much broader significance than an established route. The record abounds in testimony from persons engaged in oil refining, where tank steamships are employed as herein, that the service maintained is in its essence a roving service, the steamships classified as tramp *31 steamers, maintained to bring crude oil to the refinery from ports where the saíne is available. As illustrative of the meaning we seek to convey, the defendant concedes that since the production of oil in California has attained proportions, this very plaintiff transports the same in tank steamships from there to its refinery.
We are therefore of the opinion that as to this contention the plaintiff must prevail. In our opinion the customary service maintained means the value and use of -the vessels employed to supply the demands of the refinery transporting oil by water rather than by rail or pipe lines, either to facilitate production or reduce expense, a component part of the enterprise maintained toward and contributing to the successful operation of the refinery.
The remaining items of the counterclaim, viz, purchase of a cargo of crude oil by the plaintiff from the defendant, carried by the S. S. Halo, amounting to $79,493.54, and a similar transaction respecting a cargo carried and delivered to the plaintiff by the S. S. Halsey, amounting to $138,-431.75, conceded to be due, will be allowed. Finding XLVIII discloses the state of account. This we think is self-explanatory. We do not find it necessary to discuss the situation pertaining to the single voyage of the Van Dyhe. If we are correct as to our holding with reference to the Folger, just compensation for the use of the Van Dyhe must take the same course.
There are many other contentions advanced by the plaintiff concerned exclusively with an argument, which if effective would set aside the written instruments under which we think the vessels were used and operated, and fix just compensation upon the freights collected by the plaintiff subsequent to requisition. Issues of waiver and alleged consent to events said to be contrary to the terms of charter parties, contracts and agreements, form the basis of these various contentions. We think the case is governed by the decision of this court in the ship cases first cited. No valid or convincing reason exists for singling out the plaintiff’s fleet of tank steamships and accord them special privileges and rates above the many others taken, over at the same time, for the same purpose, and in precisely the same man *32 ner. No such reason has been proven to exist and nothing in the record warrants such a holding. The plaintiff as to the first two voyages of the Folger seeks to escape the binding effect of the agreement of June 12, 1918, and with respect to the counterclaim of the defendant predicates its defense upon the terms thereof. It is not only not proven, but in view of the record it would be impossible to decide that this plaintiff was in any respect ignorant of the precise terms and conditions upon which its vessels operated. The scope, meaning, and effect of every transaction were fully known to the plaintiff; the contracts, whether signed or unsigned, were observed by it, and it was not until long after the event that the present controversy arose. During the whole course of the war, and at the time of user by the Government, the single protest of the plaintiff as to the requisition processes was as to an obligation to accept the freight rate of $4.15 bare-boat form of charter. The plaintiff reserved its right to sue for more. This it seems to us as to the Folger and Van Dyhe constitutes the single basis for the present litigation.
The United States is awarded a judgment for $14,585.97. It is so ordered.
Green, Judge, and Grai-iam, Judge, concur.
Williams, Judge, and Littleton, Judge, did not hear and took no part in the decision of this case.